UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

JOHN V. DOE,

                Plaintiff,

      v.

HOLY SEE, et al.,

                Defendants.

No. CV 02-430-MO

OPINION AND ORDER

**MOSMAN, J.,**

Plaintiff filed this action against the Holy See, Archdiocese of Portland, and other defendants for the alleged tortious conduct of Father Andrew Ronan, a Catholic priest at St. Albert's Church in Portland, Oregon.  Plaintiff asserts three causes of action against the Holy See: respondeat superior, negligence, and fraud.  Currently before the court is the Holy See's motion (#133) to dismiss for lack of subject matter jurisdiction.  The Holy See, a foreign sovereign, is presumptively immune from suit under the Foreign Sovereign Immunity Act ("FSIA") unless an exception applies.  Plaintiff argues this court has subject matter jurisdiction under both the commercial activity exception and the tortious activity exception.  Because the tortious activity exception applies in this case, the Holy See's motion (#133) to dismiss is DENIED.

I.     FACTS

Plaintiff filed suit against the Holy See on April 3, 2002, and filed an amended complaint two years later on April 1, 2004.  In August 2005, plaintiff properly served the Holy See.  The amended complaint alleges defendants Holy See, Archdiocese of Portland, and Order of Friar

PAGE 1 - OPINION AND ORDER

Servants ("Order") placed Father Andrew Ronan ("Ronan") in St. Albert's Church in Portland in approximately 1965.  Pl.'s Compl. ¶ 15.  There, Ronan allegedly subjected plaintiff, then 15 or 16, to sexual abuse occurring in the monastery and "surrounding areas."  *Id.*

Prior to his placement in Portland, Ronan sexually molested a minor while employed with the Archdiocese of Armagh, at Our Lady of Benburb, Ireland in 1955-1956.  *Id.* at ¶ 11.  According to church records, Ronan apparently admitted to abusing the youth and was removed from his position due to his admissions.  *Id.*  Ronan was placed in defendant Order's Chicago province, at the all-boys St. Philip's High School where he worked in the private counseling office.  *Id.* at ¶ 12.  Three male students made independent reports of sexual abuse committed by Ronan, and Ronan admitted to all three reports.  *Id.*  Ronan also expressed confusion as to why he would be assigned to work in the private counseling office where temptation to molest children would be maximized.  *Id.*  In 1965, Ronan was placed in Portland.  *Id.* at ¶ 13.

For purposes of the Holy See's motion to dismiss on grounds of sovereign immunity, the significant portions of the complaint are plaintiff's allegations that bring the Holy See's actions within the commercial or tortious activity exceptions.  The most important facts alleged include the following:

> (1) Defendant Holy See has unqualified power over the Catholic Church, including each and every individual section of the Church.  *Id.* at ¶ 3.
>
> (2) Defendant Holy See directs, supervises, supports, promotes and engages in providing religious and pastoral guidance, education and counseling services to Roman Catholics world-wide in exchange for all or a portion of the revenues derived from its members for these services.  The Holy See engages in these activities through its agents, cardinals, bishops and clergy, including religious order priests, brothers and sisters, who engage in pastoral work under the authority of its bishop.  *Id.*

PAGE 2 - OPINION AND ORDER

(3)     Defendant Holy See creates, appoints, assigns and reassigns bishops, superiors of religious orders, and through the bishops and superiors of religious orders has the power to directly assign and remove individual clergy. Defendant Holy See also examines and is responsible for the work and discipline and all those things which concern bishops, superiors of religious orders, priests and deacons of the religious clergy. *Id.*

(4)     Father Ronan was employed by all defendants as a priest. The duties of Ronan's employment included but were not restricted to teaching the word of God and the law of the church, providing pastoral services, spiritual care, guidance and counseling, and obtaining financial support for the church. *Id.* at ¶ 10.

(5)     After Ronan admitted to sexually molesting minors in Armagh and Chicago, Defendant Catholic Bishop, acting in accordance with the policies, practices, and procedures of Defendant Holy See, failed to remove or discipline Ronan, or to warn others, including Defendant Archdiocese, of Ronan's propensities. *Id.* at ¶ 11-12.

(6)     Despite knowing of Ronan's dangerous propensities to abuse children, the Holy See placed Ronan in defendant Archdiocese in Portland, Oregon. *Id.* at ¶ 13.

(7)     Defendants held themselves out as the counselors and instructors on matters that were spiritual, moral and ethical. By maintaining and encouraging such a relationship with plaintiff, defendants entered into a fiduciary relationship with plaintiff. *Id.* at ¶ 14.

(8)     When plaintiff was approximately 15 to 16 years old, Ronan, using his position of authority, trust, reverence and control as a Roman Catholic priest, engaged in harmful sexual contact upon the person of plaintiff on repeated occasions. *Id.* at ¶ 15.

(9)     Ronan and Defendants Catholic Bishop, Archdiocese and Order were the agents of Defendant Holy See, acting in furtherance of the purposes of the Defendant Holy See, doing the kinds of acts they were engaged to perform, and were motivated, at least in part, to further the purposes of Defendant Holy See. *Id.* at ¶ 34.

(10)    Defendant Holy See, by and through its agents, granted Ronan faculties to perform as a Roman Catholic priest. Defendant Holy See, by and through its agents, also certified and held Ronan out to the community of the faithful as a fit and competent agent of the Holy See and a

minister of Christ. *Id.* at ¶ 35.

(11)    Plaintiff was molested by Ronan while plaintiff was under
the authority and influence of Ronan as a Roman Catholic
priest which authority was granted to him by Defendant
Holy See, Archdiocese and Order. *Id.* at ¶ 36.

## II.    SUBJECT MATTER JURISDICTION UNDER THE FSIA

### A.    Legal Standard Governing Motion to Dismiss under Rule 12(b)(1)

A party challenging the court's jurisdiction under Rule 12(b)(1) may do so either on the
face of the pleadings (a facial attack) or by presenting extrinsic evidence to refute the facts
alleged in the complaint (a factual attack). *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).
"In a facial attack, the challenger asserts that the allegations contained in a complaint are
insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373
F.3d 1035, 1039 (9th Cir. 2004).  In evaluating a facial attack to jurisdiction, the court must
accept as true the factual allegations in plaintiff's complaint. *Miranda v. Reno*, 238 F.3d 1156,
1157 n.1 (9th Cir. 2001).  Where the attack is factual, the court may consider evidence presented
on the jurisdictional issue and resolve factual disputes, if necessary. *Roberts v. Corrothers*, 812
F.2d 1173, 1177 (9th Cir. 1987); *see Valdez v. United States*, 837 F. Supp. 1065, 1067 (E.D. Cal.
1993).  The Holy See's motion to dismiss presents a facial attack to plaintiff's amended
complaint, and I will accept as true plaintiff's factual allegations.  Def.'s Motion to Dismiss
("MTD") at 1.

### B.    FSIA Statutory Framework

PAGE 4 - OPINION AND ORDER

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004) (internal quotation marks and citation omitted). Structurally, the FSIA articulates the general rule that foreign states are immune from the jurisdiction of the United States courts unless the claim against the foreign state falls within an exception to immunity. 28 U.S.C. §§ 1330(a) & 1604; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 706 (9th Cir. 1992).

The FSIA places the ultimate burden on the foreign state to show it is immune from suit. 28 U.S.C. § 1605; *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 779 (9th Cir. 1991). Initially, the foreign state must show it falls within the protection afforded by the FSIA by showing that it is, in fact, a foreign state. *Siderman*, 965 F.2d at 708 n.9. If the foreign state makes that showing, the burden of production shifts to the plaintiff to show, either by the allegations in the complaint or by extrinsic evidence, that at least one of the FSIA exceptions applies. *Id*. "Once the plaintiff offers evidence that an exception to immunity applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply." *Schoenberg*, 930 F.2d at 779 (quoting *Joseph v. Office of the Consulate General of Nigeria*, 830 F.2d 1018, 1021 (9th Cir. 1987)); *Meadows v. Dom. Rep.*, 817 F.2d 517, 522-23 (9th Cir. 1987); *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993).

Here, the sovereign status of the Holy See is not in dispute. Def.'s MTD at 5; Pl.'s Resp. at 2. Plaintiff invokes two exceptions to immunity under FSIA – the commercial activity exception, 28 U.S.C. § 1605(a)(2), and the tortious activity exception, 28 U.S.C. § 1605(a)(5). Before reaching these exceptions, the Holy See makes two threshold arguments.

PAGE 5 - OPINION AND ORDER

C.    Threshold Arguments in Holy See's Facial Attack

Before reaching the heart of FSIA immunity, the Holy See argues: (1) the court should disregard plaintiff's conclusory allegations, and (2) plaintiff's complaint fails to plead facts with specificity, especially regarding the presumed independence of the separate juridical entities of the diocese and order.

(1)    Conclusory Allegations

The Holy See correctly states that on a facial attack, plaintiff's well-pleaded allegations must be taken as true. *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). Nevertheless, the Holy See urges the court to disregard much of plaintiff's complaint because courts should not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." Def.'s MTD at 1 (quoting *Warren*, 328 F.3d at 1139).

Certain portions of plaintiff's allegations against the Holy See appear conclusory. For example, Count V alleges vicarious liability on the part of Holy See because "[t]he molestation of the plaintiff occurred while Ronan was acting in the scope of his employment." Pl.'s Compl. ¶ 36. If plaintiff's complaint contained only such conclusory statements on ultimate issues, it would probably not survive a motion to dismiss. However, much of plaintiff's complaint alleges facts, not legal conclusions, regarding the dates, players, and locations involved and descriptions of the hierarchical structure of the church. The Holy See might disagree with these characterizations, but it has not offered contradictory evidence to attack the factual underpinnings of plaintiff's complaint, nor has it explained why plaintiff's allegations are "unwarranted." I find the complaint contains sufficient well-pleaded factual allegations to overcome the argument that it is conclusory.

PAGE 6 - OPINION AND ORDER

(2)        Specificity and Separateness

The Holy See's second threshold argument urges the court to disregard plaintiff's

complaint because it fails to satisfy the FSIA's requirement of pleading facts with specificity.

*See Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 537 n.17 (5th Cir. 1992) (in suing a

foreign sovereign, plaintiff has a "duty" to allege "specific facts" sufficient to invoke an

exception to immunity); *Dames & Moore v. Emirate of Dubai*, 1996 WL 671279 at *6 (N.D.

Cal. Nov. 14, 1996) (same); *BPA Int'l, Inc. v. Kingdom of Swed.*, 281 F. Supp. 2d 73, 81 (D.D.C.

2003) (plaintiff must allege sufficient facts for the court to entertain a FSIA suit).  The Holy See

concentrates the specificity argument on the concept of separateness and points to plaintiff's

failure to allege specific facts that would overcome the presumption of independent status

accorded to foreign instrumentalities and agencies.  *See Arriba*, 962 F.2d at 533.

The FSIA's definition of "foreign state" includes a "political subdivision of a foreign state

or an agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  As explained by the

Fifth Circuit, the FSIA's normal burden shifting, in which the foreign sovereign bears the burden

of proof on immunity, is subject to an exception where jurisdiction depends on an allegation that

the defendant was an agent or instrumentality of the sovereign.  *Arriba*, 962 F.2d at 533-34.  In

that circumstance, the plaintiff bears the burden of proving the agency relationship.  *Id*. at 534.

Unlike *Arriba*, this is not a case in which plaintiff is suing only a political subdivision,

instrumentality, or agent of the sovereign.  The defendants in this case include the foreign

sovereign Holy See, which is being sued for its own negligence as well as the acts of its

"agents."  In any case, I will address the Holy See's separateness argument followed by the

specificity issue.

PAGE 7 - OPINION AND ORDER

(a)        Separateness

Holy See relies on *First National City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611 (1983), to support its argument that this court should refrain from finding the Holy See liable for the acts of the separate juridical entities of the Archdiocese and Order.  Def.'s Reply at 5.  I read *Bancec* to be unhelpful for the position advanced by the Holy See because that case articulated the flip-side of the Holy See's argument – separate juridical entities (government corporations acting independently from the government) should not be held liable for the acts of the sovereign.  *Bancec*, 462 U.S. at 626-27.  But sometimes, as in the corporate law context, the court will break down the artificial wall or veil between separate juridical entities.  The *Bancec* decision carved out two exceptions to the presumption of independence in the international context where it would be appropriate to disregard the corporate entity: (1) "where a corporate entity is so extensively controlled by its owner [sovereign] that a relationship of principal and agent is created;" and (2) where recognizing the separateness of the corporate entity would work fraud or injustice.  *Bancec*, 462 U.S. at 629-30.

In *Bancec*, the Cuban government established an autonomous state-owned bank to serve as a credit institution for foreign trade.  *Id*. at 613.  The state-owned Cuban bank sought to collect on a letter of credit issued by an American bank.  *Id*. at 615.  Shortly thereafter, the Cuban government seized all of the American bank's assets in Cuba.  *Id*.  When the Cuban bank brought suit in United States federal district court, the American bank counterclaimed, asserting its right to offset the value of its assets seized in Cuba.  *Id*. at 616.  The Cuban bank dissolved, and Cuba stepped into the shoes of plaintiff suing in America while shielding itself from counterclaims by transferring the Cuban bank's assets.  *Id*. at 632-33.  This substitution of

plaintiffs muddied the waters in that the sovereign and its corporation were less easily

categorized as separate entities.  The Court concluded the American bank could obtain a setoff in

its counterclaim, notwithstanding the fact that the Cuban bank was established as a separate

juridical entity.  *Id*. at 633.

      The *Bancec* decision was driven, at least in part, by the procedural history in that the case

involved a Cuban instrumentality suing an American company.  When a foreign sovereign brings

suit in the United States, it waives immunity from counterclaims.  28 U.S.C. § 1607.  Justice

O'Connor relied on equitable principles to disregard the corporate entity, holding:

> Giving effect to Bancec's separate juridical status in these
> circumstances, even though it has long been dissolved, would
> permit the real beneficiary of such an action, the Government of
> the Republic of Cuba, to obtain relief in our courts that it could
> not obtain in its own right without waiving its sovereign
> immunity and answering for the seizure of [the American bank's]
> assets [in violation of international law].  We decline to adhere
> blindly to the corporate form where doing so would cause such an
> injustice. . . . To hold otherwise would permit governments to
> avoid the requirements of international law simply by creating
> juridical entities whenever the need arises.

*Bancec*, 462 U.S. at 632-33 (citations omitted).  In other words, a foreign sovereign is not

entitled to immunize itself from suit for its own wrongs by hiding behind the separate juridical

status of its government corporations.

      The Holy See's separateness argument is undercut by its own briefing and an attempted

contortion of the instrumentality analysis.  Footnote three of the Holy See's reply states: "This is

not to suggest that dioceses and orders are instrumentalities of the Holy See – instead, both . . .

are even more distant than instrumentalities which can be majority-owned by the foreign

sovereign."[1]  Essentially, the Holy See culled select phrases from *Bancec* in its attempt to invoke the reverse of the presumption of independent status accorded to foreign instrumentalities, while denying that the diocese and order defendants are instrumentalities, all in order to avoid the piercing of a non-existent "corporate" veil in this religious, non-corporate, setting.

As for the application of the corporate law instrumentality concept to this case, *Bancec* does not win the day for the Holy See.  This is not a case in which an instrumentality of the Holy See has brought suit in America after which the Holy See dissolved the instrumentality and stepped into its shoes while inequitably shielding itself from counterclaims by invoking principles of corporate separateness.  If anything, *Bancec* supports a result contrary to the Holy See's position.  That is, viewing the Archdiocese and Order as separate instrumentalities of the Holy See would shield *them* from the wrongs allegedly committed by the Holy See.  This is the message of *Bancec*: foreign states cannot avoid their obligations to third parties by engaging in abuses of the corporate form.

         (b)       Specific Facts Alleging Agent-Principal Relationship

Cases relied upon by the Holy See in arguing plaintiff failed to allege facts sufficient to show an agency relationship are distinguishable.  For example, in *BPA Int'l, Inc. v. Kingdom of Sweden*, the plaintiff's complaint alleged, in very general terms, that Sweden engaged in commercial activity because it allegedly owned phone companies Telia and Validation.  281 F.

_____

    [1] If, by describing the Archdiocese and Order as "even more distant than instrumentalities," the Holy See intends to invoke canon law to prove separateness or independence, the Supreme Court has rejected this kind of choice of law.  In *Bancec*, the Court declined "[t]o give conclusive effect to the law of the chartering state in determining whether the separate juridical status of the instrumentality should be respected [because doing so] would permit the state to violate with impunity the rights of third parties under international law while effectively insulating itself from liability in foreign courts."  *Bancec*, 462 U.S. at 621-22.

PAGE 10 - OPINION AND ORDER

Supp. 2d at 80.  The undisputed facts in *BPA Int'l* showed the major wrongdoer was Validation,

a subsidiary of parent company Telefos, a company in which both its parent company, Telia, and

Sweden held an interest.  *Id*. at 81.  Notably absent from plaintiff's complaint was any allegation

of action taken by Sweden.  *Id*.  Addressing the instrumentality concept, the district court also

evaluated whether plaintiff specifically alleged any facts to overcome the presumption of

independence accorded to government corporations acting as separate juridical entities.  *Id*.  The

court concluded, the "extremely tenuous relationship between Sweden and the alleged conduct,"

and the non-existence of facts showing control exerted by Sweden over the wrongdoer, was

insufficient to show an agency relationship between Validation and Sweden.  *Id*.  Interestingly,

the court's conclusion regarding the lack of agency relationship depended on defendant's

submission of affidavits, undisputed by plaintiff, showing Sweden's lack of control over the

alleged agents.  *Id*.

Here, plaintiff's complaint contains many factual allegations asserting actions or

omissions on the part of the Holy See.  For example, plaintiff asserts the Holy See employed

Ronan and exerted supervision and control over him, Compl. ¶ 10, the Holy See misrepresented

Ronan's suitability to serve as a priest, *id*. at ¶ 14, and despite knowing of Ronan's dangerous

propensities to abuse children, the Holy See placed him at St. Albert's Church in Portland, *id*. at

¶ 13, and failed to warn those coming into contact with him.  *Id*. at  ¶ 39.  As to the agency

relationship, plaintiff also alleges facts regarding the Holy See's exercise of control over

individual clergy, the Archdiocese, bishops, and orders.  *See* Pl.'s Resp. at 11.  These allegations

include the following: (1) the Holy See has unqualified power over the Catholic Church

including each and every individual section of the church; (2) the Holy See creates, appoints,

assigns, and reassigns bishops, superiors of religious orders, and, through the bishops and superiors, it has the power to directly assign and remove individual clergy; (3) all bishops, clergy, and priests vow to show respect and obedience to the Pope; (4) in furtherance of its duty to discipline bishops, priests, and other religious clergy members, the Holy See requires bishops to file a report on a regular basis to outline the status of, and any problems with, clergy; (5) defendant Order is a religious order "Of Pontifical Right" which means that it is under the ultimate authority of defendant Holy See and not a diocesan bishop; (6) at all times material, the Holy See had the right to control Ronan, the Archdiocese, the Order, and defendant Bishop; and (7) defendants Order and Bishop were acting in accordance with the policies, practices, and procedures of the Holy See when they failed to remove or discipline Ronan and failed to warn others of Ronan's propensities.

Therefore, unlike *BPA Int'l*, it cannot be said that plaintiff's complaint is devoid of factual allegations regarding the Holy See's wrongdoing or its agency relationship with the Archdiocese, Order, and individual clergy.  Moreover, defendant Holy See has not offered any affidavit, much less an affidavit undisputed by plaintiff, with facts showing an extremely attenuated relationship between the main wrongdoer, Ronan, and the Holy See.  *Contra BPA Int'l*, 281 F. Supp. 2d at 81. This is a facial attack to plaintiff's complaint, and assuming the truth of plaintiff's specific factual allegations, I conclude plaintiff has sufficiently pled the existence of an agency relationship to overcome the presumption of independence accorded to separate juridical entities.

III.    DISCUSSION - EXCEPTIONS TO IMMUNITY UNDER FSIA

PAGE 12 - OPINION AND ORDER

By enacting the FSIA in 1976, Congress intended to codify the restrictive theory of sovereign immunity[2] under which a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts, but not as to those acts that are commercial or private in character. *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 488-89 (1983). The two potentially applicable exceptions to immunity in this case are the commercial activity exception and the tortious activity exception.

Plaintiffs in at least two other lawsuits sought to impose liability on the Holy See for the sexual abuse allegedly inflicted by a Catholic priest. *English v. Thorne*, 676 F. Supp. 761, 763-64 (S.D. Miss. 1987) (dismissing the case against the Holy See for lack of subject matter jurisdiction under the FSIA's discretionary exception to the tortious activity exception); *O'Bryan v. Holy See*, 2005 WL 2487944 (W.D. Ky. Oct. 6, 2005) (extending time for plaintiff to properly execute service on the Holy See). This may be one of the first cases in which a plaintiff has relied, at least in part, on the commercial activity exception to the FSIA in suing the Holy See based on a priest's sexual misconduct. *But see Dale v. Colagiovanni*, 337 F. Supp. 2d 825, 841 (S.D. Miss. 2004) (finding subject matter jurisdiction against the Holy See under commercial activity exception where underlying action was based not on a priest's sexual misconduct but on a monsignor's fraudulent scheme to misappropriate insurance company assets), *vacated*, 443 F.3d 425 (5th Cir. 2006).

---

[2]Under this restrictive theory, "the sovereign immunity of foreign states should be 'restricted' to cases involving acts of a foreign state which are sovereign or governmental in nature, as opposed to acts which are either commercial in nature or those which private persons normally perform." H.R. Rep. No. 94-1487, at 14 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613 [hereinafter "House Report"].

A.    Commercial Activity Exception - 28 U.S.C. § 1605(a)(2)

The commercial activity exception to jurisdictional immunity contains three clauses, any one of which satisfies the exception:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case –
>
> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; [2] or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; [3] or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2).  Of these three clauses, plaintiff raises only the first and third.

While the phrase "commercial activity" is common to both clauses of the commercial activity exception at issue, a key difference between clause [1] and [3] is what the plaintiff's action must be "based upon."  In the first clause, the action must be based on the commercial activity, whereas in the third clause, the action needs to be based on only some "act . . . in connection with a commercial activity."  *See Nelson*, 507 U.S. at 358 (attributing significance to the placement of different descriptions juxtaposed against each other and concluding that "the only reasonable reading of the [first clause] calls for something more than a mere connection with, or relation to, commercial activity.")   The other distinction between clauses [1] and [3] is the nature of the requisite jurisdictional nexus.  In the first clause, the FSIA requires the commercial activity to be "carried on in the United States" meaning, the activity has "substantial contact" with the United States.  28 U.S.C. § 1603(e).  In the third clause, the sovereign's act must have a "direct effect" in the United States.

I will turn to these distinctions between clauses [1] and [3] after a preliminary discussion

PAGE 14 - OPINION AND ORDER

of "commercial activity," an element common to both.  Because "commercial activity" is the

most important, yet ill-defined, part of the exception, it is the subject of varying judicial

interpretations.  Ascertaining its meaning is particularly important in this case.  The nature of the

Holy See makes it a very unusual sovereign state – quite possibly unique in the entire world.  For

this reason, its activities are even less easily categorized than those of a "typical" sovereign.

1.    Defining "commercial activity"

The FSIA defines "commercial activity" in a frustratingly circular fashion:

> A "commercial activity" means either a regular course of
> commercial conduct or a particular commercial transaction or act.
> The commercial character of an activity shall be determined by
> reference to the nature of the course of conduct or particular
> transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).  In passing the FSIA, Congress purposely made the definition of

"commercial activity" imprecise because it wanted to place the responsibility for making

immunity determinations on the courts, "in conformity with the principles set forth in this

chapter."  28 U.S.C. § 1602.

(a)    Judicial interpretation of "commercial activity"

In 1992, the Supreme Court concluded Argentina's issuance of government bonds

constituted "commercial activity" under the FSIA.  *Republic of Arg. v. Weltover Inc*., 504 U.S.

607, 617 (1992).  In reaching this conclusion, the Court rejected the profit test, a test that defines

commerciality in terms of profit motive, and instead adopted the "private person test."  *Id*. at

614.  The private person test recognizes that a foreign state engaging in "commercial activities"

"'does not exercise powers peculiar to sovereigns'; rather, it 'exercises only those powers that can

also be exercised by private citizens.'"  *Id*. (quoting *Alfred Dunhill of London, Inc., v. Republic of*

*Cuba*, 425 U.S. 682, 704 (1976)).[3]  In light of this restrictive theory of sovereign immunity, the

Court offered this articulation of the private person test:

> [W]hen a foreign government acts, not as a regulator of a market,
> but in the manner of a private player within it, the foreign
> sovereign's actions are "commercial" within the meaning of the
> FSIA.  Moreover, because [the FSIA] provides that the commercial
> character of an act is to be determined by reference to its "nature"
> rather than its "purpose," the question is not whether the foreign
> government is acting with a profit motive or instead with the aim
> of fulfilling uniquely sovereign objectives.  Rather, the issue is
> whether the particular actions that the foreign state performs
> (whatever the motive behind them) are the *type* of actions by
> which a private party engages in "trade and traffic or commerce."

*Weltover*, 504 U.S. at 614 (citation omitted) (emphasis in original).  Consistent with these

principles, the Court postulated that a "foreign government's issuance of regulations limiting

foreign currency exchange is a sovereign activity, because such authoritative control of

commerce cannot be exercised by a private party; whereas a contract to buy army boots or even

bullets is a 'commercial' activity, because private companies can similarly use sales contracts to

acquire goods."  *Id*. at 614-15; *see also Park v. Shin*, 313 F.3d 1138, 1145 (9th Cir. 2002) ("an

activity is commercial unless it is one that only a sovereign state could perform.").

　　In *Weltover*, the Court defined "type of activity" broadly.  *Weltover*, 504 U.S. at 614; *Sun*

*v. Taiwan*, 201 F.3d 1105, 1109 (9th Cir. 2000).  "'Type of activity' does not refer only to the

specific act performed by the government, but rather to a category of conduct.  No private party

would refinance government debt either, but the Supreme Court has held this activity to be

commercial."  *Sun*, 201 F.3d at 1109 (explaining *Weltover*).  In other words, by removing any

---

　　　[3]In adopting the private person test, the *Weltover* Court relied on its discussion of the
restrictive theory of sovereign immunity in *Alfred Dunhill*, a case the Court decided in 1976, just
six months before Congress enacted the FSIA.  *Weltover*, 504 U.S. at 612-14.

consideration of motivation from the analysis, the proper inquiry focuses on categories or types of conduct, not the specific government act. It is the difference between analyzing the refinancing of *government* debt versus the refinancing of debt. Private parties engage in the latter type of conduct regularly, and it is therefore commercial in nature. *See Weltover*, 504 U.S. at 614-16.

Based on the Supreme Court's guidance and the statutory language, other courts have applied these principles to a variety of situations to further clarify the commercial activity exception. *See, e.g.*, *Siderman*, 965 F.2d at 708-09 (sovereign's management of an expropriated business, operation of a hotel, and receipt of profits from the company's operations "are clearly activities 'of a kind in which a private party might engage.'"); *Sun*, 201 F.3d at 1107-08 (sovereign engages in commercial activity when it promotes and operates a cultural tour); *Park*, 313 F.3d at 1145 (hiring domestic servant is commercial activity because it "is not an inherently public act that only a government could perform" even if the hiring was done "in part for the purpose of providing services associated with entertaining guests of the Consulate."); *Joseph*, 830 F.2d at 1024 (sovereign's leasing of property for its consulate is a commercial activity because by renting from plaintiff, it entered the marketplace as a commercial actor); *Aldy v. Valmet Paper Mach.*, 74 F.3d 72, 75 (5th Cir. 1996) (where industrial company qualified as a "foreign sovereign," commercial activities exception is broad enough to cover suits alleging design and manufacturing defect); *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 314 (D.D.C. 2005) (sovereign engaged in "commercial activity" when it loaned art pieces to non-profit museums in the United States because a loan of this type is the kind of thing that a private party *can* do).

PAGE 17 - OPINION AND ORDER

The next step, then, in analyzing the commercial activity exception's applicability here, is to determine what activity the Holy See is alleged to have engaged in that might be categorized as commercial.  In doing so, it is very important to focus on the gravamen of plaintiff's complaint.  *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1109 (5th Cir. 1985) (cited with approval in *Nelson*, 507 U.S. at 357).  By focusing on the core of plaintiff's complaint, district courts can determine whether "the FSIA plaintiff is simply using creative nomenclature as a 'semantic ploy' to shroud the true essence of its theory" in order to obtain jurisdiction.  *Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp. 2d 277, 299 (S.D.N.Y. 2001) (citing *Nelson*, 507 U.S. at 363).  In the instant case, this focus presents a substantial hurdle to finding subject matter jurisdiction through the commercial activity exception.  The true essence of plaintiff's complaint is an allegation of sexual abuse committed by a parish priest.  The gravamen of the complaint does not appear to be commercial in nature.

> (b)  Commercial activity allegedly conducted by the Holy See

Plaintiff argues that it made "numerous allegations to show that the Holy See was acting as a private actor, namely that it was a worldwide organization with the purpose of promoting and expanding its services in return for revenue . . . the basic business plan for the majority of profit seeking corporations in the world."  Pl.'s Resp. at 5.  Unfortunately, plaintiff devotes only two paragraphs to this crucial issue, and emphasizes profit-motive as the linchpin of commerciality, which is clearly incorrect.  Nevertheless, construing the factual allegations in the light most favorable to plaintiff, it seems that plaintiff has alleged the Holy See engaged in commercial activity, including: the "Holy See directs, supervises, supports, promotes and engages in *providing religious and pastoral guidance, education and counseling services* to

PAGE 18 - OPINION AND ORDER

Roman Catholics world-wide in exchange for all or a portion of the revenues derived from its members for these services." Pl.'s Compl. ¶ 3 (emphasis added). Also, plaintiff alleged the Holy See is responsible for the work and discipline of individual clergy, including the power to directly *assign and remove* individual clergy. *Id*. (emphasis added). Plaintiff alleged that through its agent Ronan, the Holy See "*obtain[ed] financial support* for the church." *Id*. at ¶ 35 (emphasis added). Finally, the Holy See allegedly granted Ronan the authority to work as a priest and held Ronan out to the community as a fit and competent agent. *Id*. at ¶¶ 35-36.

The court must determine whether these "actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Weltover*, 504 U.S. at 614 (emphasis in original). Difficult as it may be, controlling authority requires the court to divorce from this inquiry the Holy See's religious purpose in engaging in these acts. *Nelson*, 507 U.S. at 360 (it is "a question of behavior, not motivation"). While this method of analysis can be helpful in analyzing the activities of Sweden or Cuba or Argentina, or even the more squarely commercial activities of the Holy See (such as leasing equipment or buying supplies), it is less helpful in analyzing the Holy See's more intrinsically religious activities. Nevertheless, I will attempt the analysis.

Though it is not cited by either party, I find the case of *Sun v. Taiwan* to be particularly instructive on this point. There, the parents of an American student brought a wrongful death action against Taiwan for its failure to exercise reasonable supervision, which allegedly caused their son to drown while participating in a cultural tour of Taiwan. 201 F.3d at 1106-07. The Ninth Circuit looked at the sovereign's acts as opposed to the reason for its acts, explaining "Taiwan may be acting in order to promote Chinese culture and this may in fact be a motivation

that would inspire very few private tour operators, but its actions as a promoter, organizer and guide are undoubtably acts of a kind that are undertaken regularly by private parties." *Id.* at 1108.

Like in *Sun*, it may be the case that few private actors would be motivated by a desire to promote a faith, religion, or belief system, but motivation must be stricken from the analysis. In *Weltover*, for example, the Court looked not at the refinancing of "government" bonds, but instead analyzed the refinancing of bonds in general. Here, in order to describe the activity by its type, the court should remove the word "religious" from the inquiry insofar as it inserts purpose into the court's consideration. Thus, the Holy See's provision of "religious and pastoral guidance, education and counseling services" should be broadly categorized as providing guidance, education and counseling services in general. Clearly, private actors *can* provide counseling services, education and guidance. These are not the kinds of activities in which only government actors may engage.

As for the other alleged activities of the Holy See, private actors regularly impose discipline on individual agents and can assign and remove those agents. This is not the *type* of activity that only a sovereign can do, and therefore it is commercial. Likewise, private parties can and do obtain financial support in the marketplace, and this is true for both non-profit and profit-seeking ventures. The fact that parishioners typically provide financial support without a contractual relationship to the recipient does not matter; donor-donee transactions in the nonprofit realm may still qualify as commercial activities. *See Malewicz*, 362 F. Supp. 2d at 314; *Weltover*, 504 U.S. at 616 ("Engaging in a commercial act does not require the receipt of fair value, or even compliance with the common-law requirements of consideration."). Finally,

PAGE 20 - OPINION AND ORDER

holding an employee out as one who has the authority to act is the type of activity that private parties conduct in the marketplace.

Under the above analysis, with purpose and motive deleted from the evaluation, the alleged activities of the Holy See might be characterized as commercial. This would be, to say the least, ironic. While the Holy See undoubtably engages in numerous activities that are squarely commercial, the alleged activities here are widely viewed as the antithesis of commerciality. To describe core religious duties as the equivalent of private commercial activity may superficially apply existing precedent, but ultimately results in a transmogrification of the facts.[4]

Fortunately, the law does not require this result. While there are certain steps of inquiry laid out, the Supreme Court has counseled courts not to lose sight of the ultimate issue: whether the true essence of the complaint is commercial. *Nelson*, 507 U.S. at 363. Here, plaintiff's complaint does not allege property damage, breach of contract for goods or services, product liability, copyright infringement, an indebtedness yet unpaid on a loan or other transaction, or any other theory whose true essence is commercial. Instead, at the heart of plaintiff's complaint is the injury inflicted by a sexually abusive priest at plaintiff's church, a claim clearly sounding in tort.

The typical application of the commercial activity exception, and its relevant caselaw, may not fit very well to this case because of the unusual nature of this sovereign. But in the final analysis, the question is whether the complaint alleges activities that are commercial in nature. It

---

[4]It might be possible, under existing precedent, to say that a priest administering communion to a supplicant who makes donations to the church is like a private actor selling bread.

PAGE 21 - OPINION AND ORDER

does not.  For this reason, this court does not have subject matter jurisdiction under the FSIA

commercial activity exception to the Holy See's sovereign immunity.

The issue, however, is both novel and close.  The court will therefore continue its

analysis of the remaining steps of the commercial activity exception as though the activities are

commercial.  The overarching question of whether the alleged conduct constitutes commercial

activity is only the beginning of the analysis for the commercial activity exception.  The next

steps under clauses [1] and [3] require the court to determine whether plaintiff's suit is based on

either the commercial activity or an act in connection with the commercial activity, and whether

the Holy See's activities satisfy the requisite jurisdictional nexus to the United States.

### 2.      Commercial activity exception, clause [1]

For there to be jurisdiction under the first clause of the commercial exception, plaintiff's

action must be based upon a commercial activity by the Holy See that had "substantial contact"

with the United States within the meaning of the FSIA.  *Nelson*, 507 U.S. at 356.

#### (a)      ". . . action *based upon a* commercial activity"

The touchstone for determining whether claims are "based upon" commercial activity for

purposes of the first clause is the Supreme Court's decision in *Saudi Arabia v. Nelson*.  There, the

plaintiff responded to recruitment efforts in the United States for doctors to come to Saudi

Arabia to work for a Saudi government-owned hospital.  507 U.S. at 351-53. Plaintiff claimed

Saudi agents imprisoned and tortured him in retaliation for his reporting to government and

hospital officials the safety problems he discovered at the hospital.  *Id*.  After his release,

plaintiff sued Saudi Arabia, asserting a variety of common law tort theories, including failure to

warn.  The Court developed this test for meeting the "based upon" element: "In denoting conduct

that forms the 'basis,' or 'foundation,' for a claim, the phrase is read most naturally to mean those

elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."

*Id*. at 357 (internal citations omitted) (citing *Callejo*, 764 F.2d at 1109 (the focus should be on

the "gravamen of the complaint")).  While recruiting plaintiff, having him sign an employment

contract, and subsequently employing him were arguably commercial activities that *led to*

plaintiff's injuries, the Court held that they did not form the *basis of* his suit.  *Id*. at 358.  Rather,

plaintiff's suit was based upon the Saudi government's wrongful arrest, imprisonment, and torture

of plaintiff – conduct that cannot be considered "commercial" because "a foreign state's exercise

of the power of its police has long been understood . . . as peculiarly sovereign in nature."  *Id*. at

361.

Footnote four of *Nelson* clarifies what the Court does not address regarding the "based

on" element: "We do not mean to suggest that the first clause of § 1605(a)(2) necessarily

requires that each and every element of a claim be commercial activity by a foreign state, and we

do not address the case where a claim consists of both commercial and sovereign elements."  *Id*.

at 358 n.4.[5]  The Ninth Circuit has relied on this footnote to hold that "[t]he entire case need not

be based on the commercial activity of the defendant."  *Sun*, 201 F.3d at 1109.

Under the Court's holding in *Nelson* and Ninth Circuit interpretation of the same,

jurisdiction through clause [1] of the commercial activity exception hinges on a finding that the

Holy See's commercial activity itself gives rise to at least one element in plaintiff's claim.  The

commercial activity must do more than *lead to* the injuries plaintiff suffered, it must be the *basis*

---

[5] In his concurrence, Justice White criticized the majority for sidestepping the fact that
defendant's conduct at the very least consisted of both commercial and sovereign elements, thus
presenting the very situation that the Court chose to elude in footnote four.  *Id*. at 367.

*of* some element in plaintiff's suit. *See Sun*, 201 F.3d at 1109-10 (plaintiff's complaint is not

"based on" the commercial activities alleged, "the promotion and application process in the

United States," because that "was not conduct involved in proving any of the elements of the

Suns' action."); *see also Sugimoto v. Exportadora De Sal, S.A. De C.V.*, 19 F.3d 1309, 1311 (9th

Cir. 1994). In other words, if the sovereign's commercial activity is "not conduct involved in

proving any of the elements" of plaintiff's cause of action, the "based on" element is not satisfied.

*Sun*, 201 F.3d at 1110.

The Holy See argues plaintiff fails to meet the "based on" element because plaintiff's

claims are based on the alleged tortious acts of Ronan, not the commercial activity of the Holy

See. Def.'s Reply at 11. In support of this argument, the Holy See analogizes to the distinction

in *Nelson* where the purported commercial activities *led to* the conduct that eventually injured

plaintiff, but such activities were not the basis of plaintiff's suit. Plaintiff asserts causes of action

for respondeat superior, negligence, fraud and conspiracy to commit fraud. The question is

whether any element of any of these claims is based on the Holy See's commercial activities,

especially in light of Oregon's unique take on employer liability.

(i)     Respondeat superior

For the respondeat superior claim, Oregon courts follow an expansive doctrine in which

an employer is liable not only for the torts of his employee when the employee is acting within

the scope of his employment, *Stanfield v. Laccoarce*, 588 P.2d 1271, 1274 (Or. 1978), but also

for the intentional criminal acts of employees if the acts that lead to the criminal conduct were

within the scope of employment. *Fearing v. Bucher*, 977 P.2d 1163, 1166 (Or. 1999) (under the

expansive theory, "[t]he Archdiocese still could be found vicariously liable, if the acts that were

PAGE 24 - OPINION AND ORDER

within [the priest's] scope of employment resulted in the acts which led to injury to plaintiff.")

(internal quotation marks and citation omitted).[6]  In order to establish respondeat superior under

Oregon law, plaintiff proves one element by showing Ronan was acting within the scope of his

employment in the acts that *led to* the sexual abuse of plaintiff, a basis of liability the Holy See

ignores.

Oregon's test for respondeat superior, with its "led to" language, injects some confusion

into the analysis of commercial activity considering *Nelson*'s caution against finding jurisdiction

for commercial activities that merely led to plaintiff's injury rather than forming its basis.  The

principal commercial activity on which plaintiff relies that led to his sexual abuse was the

provision of counseling services to parishioners.  The cases do not exactly address the

intersection we have here, where, by *leading to* the injuries plaintiff suffered, the commercial

activity of providing counseling is the *basis of* some element in plaintiff's suit.  *See Sun*, 201

F.3d at 1109-10.

This court has already concluded that the complaint, as a whole, does not state a claim

within the commercial activities exception.  But even if one analyzes the provision of counseling

services in isolation, and views this activity as commercial, there is an inevitable tension

between *Nelson* and *Sun*.  On one hand, it would be prudent to heed the caution from the United

States Supreme Court in finding that it is not enough, under the commercial activity exception,

that the commercial activity leads to plaintiff's injury, even if "action leading to injury" is an

element in Oregon's expansive theory of respondeat superior.  On the other hand, FSIA cases

---

[6] For more on Oregon's recognition of the validity of respondeat superior claims asserted against religious organizations for the sexual misconduct of individual clergy members, see Michael J. Sartor, *Respondeat Superior, Intentional Torts, and Clergy Sexual Misconduct: The Implications of* Fearing v. Bucher, 62 Wash. & Lee L. Rev. 687 (2005).

PAGE 25 - OPINION AND ORDER

recognize that state law governs the 'scope of employment' determination.  *See Randolph v. Budget Rent-A-Car*, 97 F.3d 319, 325 (9th Cir. 1996) ("where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances") (quoting *Bancec*, 462 U.S. at 622 n.11).  Ultimately, this court concludes that the Supreme Court's construction of the federal statutory language controls.  Even though plaintiff's respondeat superior claim alleges commercial activities leading to a tort, this is not enough to meet the *Nelson* Court's interpretation of "based on."

(ii)     Negligence

The law of negligence in Oregon is premised on the general foreseeability principle announced in *Fazzolari v. Portland Sch. Dist. No. 1J*, 734 P.2d 1326, 1336 (Or. 1987): "[U]nless the parties invoke a status, a relationship or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."  In Count VI, plaintiff seems to allege common law negligence against the Holy See because it "knew or reasonably should have known of Ronan's dangerous and exploitive propensities as a child sexual abuser . . . and despite such knowledge, Defendant negligently retained Ronan and failed to warn those coming into contact with him . . . [and] Defendant failed to provide reasonable supervision of Ronan, failed to use reasonable care in investigating Ronan, and failed to provide adequate warning to plaintiff and his family."  Pl.'s Compl. ¶ 39.

In a similar case against the Archdiocese in this district, Judge Jones adopted a Findings and Recommendation ("F&R") by Judge Ashmanskas that described the foreseeability element

PAGE 26 - OPINION AND ORDER

of negligence.  *G.B. v. Archdiocese of Portland in Oregon*, 2002 WL 31441220 (D. Or. April 18,

2002).  The court explained, "an employer who has knowledge of an employee's predilection to

sexually abuse young boys unreasonably creates a foreseeable risk by allowing the employee

uninhibited access to young boys." *Id*. at *6.  Here, the Holy See's conduct in retaining Ronan,

despite knowing of his propensities, failing to reasonably supervise him, and failing to warn

those coming into contact with him, forms the basis for the negligence claim against the Holy

See.  Assuming the Holy See's conduct in retaining and assigning priests is commercial, such

conduct certainly gives rise to the foreseeability element of plaintiff's negligence claim, and

therefore meets the *Nelson* test for "based on."

(iii)  Fraud or conspiracy to commit fraud

To prove fraud, a plaintiff must establish: a representation, its falsity, its materiality, the

speaker's knowledge of its falsity or ignorance of its truth, the speaker's intent that the

representation should be acted upon by the listener in the manner reasonably contemplated, the

listener's ignorance of the representation's falsity, the listener's reliance on the truth of the

representation, the listener's right to rely thereon, and the listener's consequent and proximate

injury.  *Webb v. Clark*, 546 P.2d 1078, 1080 (Or. 1976).  One of the activities the Holy See

allegedly conducted was granting Ronan the authority to perform as a priest and holding Ronan

out to the community as a fit and competent agent.  *Id*. at  ¶¶ 35-36.  Assuming this activity is

commercial, it would establish one of the elements needed to prove fraud – the speaker's intent

that the representation should be acted upon by the listener in the manner reasonably

contemplated – and therefore meets the *Nelson* test for "based on."

(b)      ". . . carried on *in the United States*."

Under the first clause to the commercial activity exception, besides determining whether the claim is "based on" "commercial activity," the court must also analyze whether the sovereign's commercial activity is being "carried on in the United States."  28 U.S.C. § 1605(a)(2).  The FSIA's definitions section, § 1603, defines the entire first clause of the exception and relaxes the seemingly stringent nexus of "in the United States" to mean "substantial contact with the United States."  28 U.S.C. § 1603(e).  Thus, "[a] 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such a state and having substantial contact with the United States."  *Id*.  The Court did not reach this "substantial contact" element in *Nelson* because it concluded the sovereign did not engage in commercial activity.  *Nelson*, 507 U.S. at 356.  In the Ninth Circuit's *Siderman* decision, the substantial contact requirement was met by plaintiff's allegations that Argentina advertised in the United States for a hotel in Argentina and solicited American guests through its United States agent.  965 F.2d at 709.

Neither party addresses this element of clause [1], and I read plaintiff's complaint to allege the Holy See's commercial activities have at least substantial contact with the United States.  While the Holy See's employment decisions regarding the retaining or assigning of Ronan may have occurred inside the Vatican, the activities arising from those decisions had substantial contact in the United States.  Ronan was transferred from Chicago to Portland, Ronan provided guidance and counseling services in Portland, the Holy See allegedly failed to remove Ronan from priestly duties in Portland, the Holy See allegedly held Ronan out as a fit and competent agent to Portland parishioners, and the Holy See failed to warn Portland parishioners.

PAGE 28 - OPINION AND ORDER

*Cf. Sun*, 201 F.3d at 1110 (remanding to district court for lack of subject matter jurisdiction because all of the sovereign's conduct giving rise to plaintiff's complaint occurred in Taiwan).

3.      Commercial activity exception, clause [3]

The third clause of the commercial activity exception requires the court to consider whether plaintiff's lawsuit: (1) is based "upon an act outside the territory of the United States"; (2) that was taken "in connection with a commercial activity" of the Holy See outside this country; and (3) that "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2); *Weltover*, 504 U.S. at 611.  The Holy See attacks plaintiff's complaint solely on the "direct effect" element.  Def.'s Reply at 14-15.  In *Weltover*, the Court rejected the contention that an effect is direct only if it is substantial and foreseeable.  504 U.S. at 618.  Instead, "an effect is 'direct' if it follows as an immediate consequence of the defendant's activity."  *Id.* (internal quotation marks and citation omitted).

The Holy See contends the "direct effect" element is not met where intervening causes or acts of an intermediary (Ronan) create the effect.  Def.'s Reply at 15 (citing cases, including: *California v. NRG Energy Inc.*, 391 F.3d 1011, 1024 (9th Cir. 2004) (because sovereign's decisions "affected an intermediary, whose actions in turn affected the U.S., the decisions did not have direct effects within the United States."); *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1083 n.3 (9th Cir. 2001) ("'immediate' means "acting or being without the intervention of another object, cause or agency."') (citation omitted); *Corzo v. Banco Cent. de Reserva del Peru*, 243 F.3d 519, 525 (9th Cir. 2001) (no direct effect where plaintiff's injuries "were at best secondary or incidental results of the [sovereign's] actions")).  Plaintiff argues it sufficiently alleged "direct effects" in the United States because the Holy See was negligent in retaining and supervising

Ronan, because the Holy See employed Ronan and is vicariously liable for his actions, and because the Holy See defrauded plaintiff. Both parties rely on *Lyon* to support their respective arguments.

In *Lyon*, the Ninth Circuit found there was a direct effect where a plane that was negligently designed and manufactured by an Italian instrumentality crashed in California, killing two passengers. 252 F.3d at 1083. Interpreting "direct effect" after "eschew[ing] both substantiality and foreseeability," the Ninth Circuit instructed that a proper reading of the phrase, particularly in the context of product liability, "should focus on whether some intervening act broke the chain of causation leading from the asserted wrongful act to its impact in the United States." *Id.* Other product liability lawsuits reach similar results on the direct effect issue. *See, e.g.*, *Vermeulen v. Renault U.S.A., Inc.*, 985 F.2d 1534, 1545 (11th Cir. 1993) ("We can hardly imagine a more immediate consequence of the defendant's activity" than plaintiff suffering injuries in a car accident in Georgia as a result of defendant's negligent design and manufacture of the vehicle's passenger restraint system); *Aldy*, 74 F.3d at 75 (holding plaintiff's allegations that Aldy's death in America was immediate consequence of Valmet's negligent design and manufacturing of the paper machine were sufficient to satisfy "direct effect"). *Aldy* goes even farther, extending the reach of what constitutes a direct effect by including allegations of negligent failure to warn. *Id.* at 76.

The Holy See makes a strong argument that plaintiff's injuries resulted not from the Holy See's conduct, but from the intervening cause of Ronan's sexual misconduct – the acts of an intermediary created the "effect" and therefore this effect is not an "immediate consequence" of the Holy See's activity. At first glance, this logic makes sense, but a more critical approach is

PAGE 30 - OPINION AND ORDER

necessary.  The Holy See argues "there were a series of intervening causes such as Ronan's

contact with plaintiff's family and Ronan's decision to commit sexual abuse."  Def.'s Reply at 15.

Ronan's contact with plaintiff, however, would not have been possible but for the Holy See's

conduct in reassigning Ronan from Benburb to Chicago and then to Portland, each reassignment

coming on the heels of Ronan's admissions of sexually abusing minors, and each reassignment

taking place without the Holy See warning Ronan's new parishioners.  In this way, it cannot be

said that plaintiff's injuries were "incidental results" tenuously situated at the end of a causal

chain set in motion by the Holy See.  *Contra Corzo*, 243 F.3d at 525.  Thus, if the activities in

question were viewed as commercial, they should be viewed as causing a direct effect in the

United States.

To summarize, plaintiff's allegations, if taken as true, might be sufficient under clauses

[1] or [3] of the commercial activity exception to remove the Holy See from the presumption of

immunity afforded by the FSIA, if these activities could be fairly characterized as commercial.

Bus as to that threshold question, I conclude the overarching principle explained in *Nelson*

requires this court to hold the activities alleged in this complaint are not commercial and the

Holy See retains sovereign immunity at least as to the commercial activity exception.

B.      Tortious Activity Exception - 28 U.S.C. § 1605(a)(5)

The tortious activity exception to sovereign immunity states:

> A foreign state shall not be immune from the jurisdiction of courts
> of the United States or of the States in any case –
>
> not otherwise encompassed in paragraph (2) above, in which
> money damages are sought against a foreign state for personal
> injury or death . . . occurring in the United States and caused by
> the tortious act or omission of that foreign state or of any official
> or employee of that foreign state while acting within the scope of

PAGE 31 - OPINION AND ORDER

his office or employment; except this paragraph shall not apply to –

    (A)    any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

    (B)    any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[.]

28 U.S.C. § 1605(a)(5).

Plaintiff agrees with the Holy See regarding the effect of the misrepresentation exception contained in 28 U.S.C. § 1605(a)(5)(B).  Pl.'s Resp. at 22.  Under part (B), plaintiff's fraud cause of action would most likely be barred by the express limitation for claims of misrepresentation.  *See Johnsen v. Mel-Ken Motors, Inc.*, 894 P.2d 540, 545 (Or. Ct. App. 1995) (elements to establish intentional misrepresentation and fraud are identical).  Therefore, only two of plaintiff's theories of liability against the Holy See require further analysis under the tortious activity exception – respondeat superior and negligence.  As to its respondeat superior liability, the Holy See argues the tortious activity exception does not apply because the complaint fails to allege Ronan is an "employee acting within the scope of his employment."  As to plaintiff's claim that the Holy See itself acted negligently, the Holy See argues the tortious activity exception does not apply because the entire tort did not occur in the United States, and even if it did, the Holy See is entitled to the safe harbor provided by the "discretionary function" exception found in 28 U.S.C. § 1605(a)(5)(A).

    (1)    Respondeat superior liability

Under the plain language of the statute, the Holy See is not immune from the jurisdiction of this court for plaintiff's injuries if they were "caused by . . .  any official or employee of [the

PAGE 32 - OPINION AND ORDER

Holy See] while acting within the scope of his office or employment."  28 U.S.C. § 1605(a)(5).

(a)    Was Ronan an employee or agent of the Holy See?[7]

Under the FSIA's tortious activity exception, the question of whether Ronan was an

"employee" of the Holy See is governed by Oregon state law.  *Randolph*, 97 F.3d at 325.  In

*Randolph*, plaintiffs were injured in a car accident and sought to establish jurisdiction under the

tortious activity exception.  The Ninth Circuit confronted the question of whether a Saudi

Arabian student trainee, in the United States on a state-sponsored scholarship, qualified as an

"employee" of the sovereign.  *Id*.  The court applied California law and concluded the student

was not an "employee" because "his activities in the United States did not aid [the sovereign] in

its daily operations or confer an immediate benefit on [the sovereign]."  *Id*. at 326.

Under Oregon law, an employment relationship turns on "the right of one party to control

the activities of the other."  *Jenkins v. AAA Heating & Cooling, Inc*., 421 P.2d 971, 973 (Or.

1966); *see also Schaff v. Ray's Land & Sea Food Co.*, 45 P.3d 936, 942 (Or. 2002) (an employee

is a person "who with respect to the physical conduct in the performance of the services is

subject to the other's control or right to control.").  The Holy See overemphasizes the phrase

"control the physical conduct" in arguing that it clearly did not exert this kind of control over

Ronan's job performance.  Def.'s MTD at 15.  This interpretation is too narrow and overlooks

Oregon's principle test of whether an individual is an employee – the "right to control

performance" test.  *Jenkins*, 421 P.2d at 973.

---

[7] The Holy See's MTD attacks plaintiff's complaint on the grounds that it does not
sufficiently plead that the Order, Archdiocese, and Bishop were "agents" of the Holy See
because those entities are presumed to be separate juridical entities.  I rejected this argument in
part II(C)(2)(b) of this opinion.  This section focuses on the sufficiency of plaintiff's allegations
regarding Ronan's employment.

There are four factors the Oregon courts consider in applying the right to control test: "(1) direct evidence of the right to, or exercise of, control; (2) the furnishing of tools and equipment; (3) the method of payment; and (4) the right to fire." *Stamp v. Dep't of Consumer & Bus. Servs.*, 9 P.3d 729, 731 (Or. Ct. App. 2000). "No single factor is dispositive in all instances," but in some cases, "a single factor that indicates an employer-employee relationship" may be sufficient to establish employee status. *Id.* at 733-34 (satisfying all four factors is not a prerequisite to classifying worker as an employee).

Plaintiff's response lists the allegations made in the complaint establishing Ronan was an employee or agent of the Holy See. Pl.'s Resp. at 14. These allegations include: the Holy See employed priests, including Ronan, to provide religious and pastoral services, Compl. ¶ 10; Ronan was a Roman Catholic priest under the direct supervision and control of the Holy See, *id*; all priests vow to show respect and obedience to the Pope and their bishop, *id*. at ¶ 3; the Holy See examines and is responsible for the work and discipline and all those things which concern priests, *id*; despite knowing of Ronan's dangerous propensities, the Holy See placed Ronan in Portland, *id*. at ¶ 13; the Holy See had the right to control its agent Ronan, *id*. at ¶ 34; the Holy See, by and through its agents (the Archdiocese, Bishop, and Order) granted Ronan facilities to perform as a priest, *id*. at ¶ 35.

Putting aside the conclusory allegations that "the Holy See employed Ronan," and "had the right to control its agent Ronan," and taking plaintiff's other allegations to be true, it appears that plaintiff has sufficiently alleged facts to show Ronan was an employee. On the first factor, the right to exercise or actual exercise of control, plaintiff alleged the Holy See not only had the *right* to control Ronan, *id*. at ¶ 34, but also actually exercised this right when it "placed Ronan in

Portland, Oregon." *Id.* at ¶ 13.  The Holy See does not offer evidence to contradict this allegation of its involvement in transferring a known child-molester.  In addition, plaintiff alleges facts going to the second factor in that the Holy See, through its agents, furnished Ronan with facilities (similar to tools and equipment) to perform his duties.  *Id.* at ¶ 35.  Plaintiff does not allege facts in support of the third factor, the manner in which Ronan received compensation. Finally, on the fourth factor, plaintiff's complaint asserts the Holy See is responsible for disciplining priests, *id.* at ¶ 3, which, generously construed, would include a right to fire or terminate their employment.  In sum, plaintiff alleged facts supporting at least three of the four factors in the right to control test, and therefore, sufficiently alleged Ronan was an employee of the Holy See.

(b)      Was Ronan acting within the scope of his employment?

Under the FSIA, "[t]he 'scope of employment' provision of the tortious activity exception essentially requires a finding that the doctrine of respondeat superior applies to the tortious acts of individuals." *Joseph*, 830 F.2d at 1025.  Again, whether a sovereign's employee acted within the scope of his employment is governed by state law.  *Id*; *Randolph*, 97 F.3d at 326-27.  The Holy See acknowledges the Oregon case of *Fearing v. Bucher*, and relies on it for the proposition that sexual abuse by a priest is *not* within the scope of his employment.  Def.'s MTD at 17.  However, this incomplete description of *Fearing*'s holding is misleading.

As previously explained, Oregon has adopted an expansive theory of 'scope of employment' in which an employer is liable not only for the torts of his employee when the employee is acting within the scope of his employment, *Stanfield*, 588 P.2d at 1274, but also for the intentional criminal acts of employees if the acts that lead to the criminal conduct were

PAGE 35 - OPINION AND ORDER

within the scope of employment. *Fearing*, 977 P.2d at 1166. There are three requirements that must be met to establish an employee's conduct falls within the scope of his employment: "(1) the conduct must have occurred substantially within the time and space limits authorized by the employment; (2) the employee must have been motivated, at least partially, by a purpose to serve the employer; and (3) the act must have been the kind that the employee was hired to perform." *Id*. (citing *Chesterman v. Barmon*, 753 P.2d 404 (1988)).

Similar to the complaint in this case, the plaintiff in *Fearing* alleged the priest used his position as youth pastor, spiritual guide, and confessor to gain the trust of plaintiff and his family. *Id*. at 1166. By virtue of that relationship, the priest gained the opportunity to be alone with plaintiff, to touch him physically, and then to assault him sexually. Those activities were allegedly committed within the time and space limitations of the priest's employment, and the priest was motivated, at least partially, out of the priest's desire to fulfill his duties as youth pastor and priest. The Oregon Supreme Court concluded these allegations were sufficient to establish the priest's conduct leading up to the abuse was within the scope of employment. *Id*. at 1167.

Here, contrary to the Holy See's contention, plaintiff's complaint is based on more than Ronan's ultimate sexual abuse of plaintiff. Plaintiff alleges conduct by Ronan, conduct leading up to his criminal action, that was within the scope of his employment. Specifically, plaintiff alleges Ronan sought and gained the trust of plaintiff and his family and then obtained consent for plaintiff to participate in counseling and other activities. Compl. ¶ 18. This conduct occurred substantially within the time and space limits of his employment because Ronan's duties included providing pastoral services, guidance, and counseling. Second, plaintiff alleges

Ronan was motivated, at least partially, by a desire to serve the Holy See. *Id*. at ¶¶ 18, 34.

Third, gaining plaintiff's trust and providing counseling to plaintiff were the kinds of actions

Ronan was hired to perform. *Id*. at ¶¶ 18, 34-35. Therefore, under *Fearing*, plaintiff has

sufficiently alleged facts showing that Ronan's conduct preceding the sexual abuse fell within the

scope of his employment. Under Oregon law, this is sufficient grounds upon which to hold

Ronan's employer liable under a theory of respondeat superior.[8]

> (2)    Negligence liability

In addition to allowing jurisdiction for injuries caused by a sovereign's employees,

jurisdiction via the tortious activity exception may also be found based on personal injuries

"occurring in the United States and caused by the tortious act or omission of that foreign

state." 28 U.S.C. § 1605(a)(5). Count VI of plaintiff's complaint asserts a claim of negligence

against the Holy See on the grounds that it knew or reasonably should have known of Ronan's

dangerous propensities as a child abuser, but despite such knowledge, negligently retained

Ronan and negligently failed to warn those coming into contact with him, thus allowing Ronan

to assume positions of trust and authority as a priest where he was able to commit additional

wrongful acts. Compl. ¶ 39. Plaintiff alleges the Holy See failed to provide reasonable

supervision, failed to use reasonable care in investigating Ronan, and failed to provide adequate

---

[8]I acknowledge that I am applying *Fearing*'s respondeat superior analysis here, while declining to apply *Fearing* in analyzing the "based upon" element within the commercial activity exception. *See* part III(A)(2)(a)(i). These are, of course, very different contexts. The commercial activity exception looks to whether the Holy See's commercial activities give rise to at least one element of plaintiff's respondeat superior claim. The tortious activity exception looks to whether Ronan was acting within the scope of his employment. The latter question is purely a question of state law, as to which *Fearing* provides a direct answer. The former question, while involving state law, is ultimately controlled by Supreme Court precedent as to the meaning and scope of a federal statute.

PAGE 37 - OPINION AND ORDER

warning to Portland parishioners. *Id.*

The Holy See attacks the applicability of the tortious activity exception as to the negligence claim on two grounds: (a) plaintiff failed to show the entire tort occurred "in the United States," and (b) the discretionary function exception to the tortious activity exception shields the Holy See from this court's exercise of jurisdiction.[9]

      (a)    Did the Holy See's alleged negligence occur in the United States?

Under the FSIA, "[a] foreign state shall not be immune from the jurisdiction of the courts of the United States in any case . . . in which money damages are sought against a foreign state for personal injury or death . . . occurring *in the United States* and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment . . . ."  28 U.S.C. § 1605(a)(5) (emphasis added). The Holy See contends that in order to meet the requirements of the tortious activity exception, the entire tort must occur in the United States, including both the injury and the alleged acts or omissions of the foreign sovereign.  Def.'s MTD at 18; Def.'s Reply at 20.  In support of this argument, the Holy See relies on *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989), and lower court cases from several districts, including *Intercontinental Dictionary*

_____

[9]On the facts of this case, it appears these two arguments advanced by the Holy See only apply to plaintiff's negligence claim and not to the claim for respondeat superior.  That is, the very nature of respondeat superior liability is that a foreign principal can be held liable for the acts of its agent in the United States, even if the actions of the principal were not in the United States.  As to the discretionary function exception, the Holy See recognizes the law of the Holy See prohibits sexual abuse.  Def.'s MTD at 10 (citing 1983 Code c.1395, § 2).  Therefore, in evaluating the applicability of the discretionary function exception to plaintiff's respondeat superior claim, the first step of the two-part test is not satisfied because Ronan had no discretion under the sovereign's law.  *Berkovitz v. United States*, 486 U.S. 531, 536 (1998) (holding discretionary function exception does not apply where the sovereign's law "specifically prescribes a course of action for the employee to follow.").  In any event, in its briefing the Holy See has only advanced these two arguments against plaintiff's negligence claim.

PAGE 38 - OPINION AND ORDER

*Series v. De Gruyter*, 822 F. Supp. 662, 677 (C.D. Cal. 1993) ("in order for the 'noncommercial tort' exception to be applicable, both the tortious acts or omissions and the injury must occur within the United States").  Plaintiff responds with its own interpretation of the FSIA language – the tortious activity exception dictates only that the personal *injury* occur in the United States, but not the omission of the foreign state.  The placement of the clause "in the United States" after "injury" but before "caused by act or omission" reinforces plaintiff's reading.  But, after reviewing the relevant cases, including controlling Ninth Circuit law, the proper interpretation of "in the United States" lies in the middle ground between the readings advanced by the parties.

Although not cited by either party, the Ninth Circuit has spoken on this issue in *Olsen v. Government of Mexico*, 729 F.2d 641, 645-46 (9th Cir. 1984) *abrogation in part on other grounds recognized by Joseph*, 830 F.2d at 1026.  Subsequent Supreme Court and Ninth Circuit law eliminated a distinction made in *Olsen* and other cases between "planning level" and "operational level" government actions when evaluating the discretionary function exception. *Joseph*, 830 F.2d at 1026.  However, *Olsen*'s analysis of "in the United States" has never been overruled and remains good law.

In *Olsen*, an airplane owned and operated by the Mexican government departed Monterrey, Mexico, bound for an airport in Tijuana.  *Olsen*, 729 F.2d at 643.  Due to adverse weather conditions at the destination, the pilot rerouted the plane into United States airspace to approach Tijuana from the west.  *Id*.  The pilot failed to maintain proper altitude and, after striking a telephone pole, crashed the plane less than one mile inside the United States.  *Id*. at 644.  Mexico, relying on *Matter of SEDCO*, 543 F. Supp. 561 (S.D. Tex. 1982), urged the Ninth Circuit to read the tortious activity exception to require all of the alleged tortious conduct to

occur in the United States, which would render the exception inapplicable because some of the

pilot's alleged negligence took place in Mexican airspace.  *Olsen*, 729 F.2d at 646.  The Ninth

Circuit declined to adopt this interpretation, finding:

> The instant case is distinguishable from *SEDCO* in one crucial
> respect.  In *SEDCO*, *none* of the alleged acts or omissions, only the
> resultant injury, occurred in the United States.  By requiring every
> aspect of the tortious conduct to occur in the United States, a rule
> such as in *SEDCO* would encourage foreign states to allege that
> some tortious conduct occurred outside the United States.  The
> foreign state would thus be able to establish immunity and
> diminish the rights of injured persons seeking recovery.  Such a
> result contradicts the purpose of the FSIA, which is "to serve the
> interests of justice . . . ."

*Id*. (citing *Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984) as

distinguishable on the same grounds).  The Ninth Circuit concluded that "if plaintiffs allege at

least one entire tort occurring in the United States, they may claim under section 1605(a)(5)."

*Id*.[10]

The Holy See relies on *Amerada Hess* to support its argument that the tort exception is

inapplicable unless the Holy See's alleged acts or omissions occurred entirely within the United

States.  Def.'s Reply at 20.  In *Amerada Hess*, a Liberian company sued the Argentine Republic

for destruction of an oil tanker on the high seas "well outside the 3-mile limit then in effect for

the territorial waters of the United States."  488 U.S. at 441.  Unlike the facts in our case, neither

---

[10] It is unclear whether, under *Olsen*, a court has jurisdiction over all of a plaintiff's
noncommercial tort claims so long as one occurred in the United States, or if *Olsen* means a
court has jurisdiction over *only* those torts occurring in the United States.  *See Greenpeace Inc.,
(U.S.A.) v. State of France*, 946 F. Supp. 773, 785-86 (C.D. Cal. 1996) (holding where plaintiff
alleged multiple torts committed by the sovereign, subject matter jurisdiction is determined on a
tort-by-tort basis).  The answer does not matter for this case because only one of plaintiff's
claims, the negligence claim against the Holy See, is under scrutiny for not having occurred "in
the United States."  Def.'s Reply at 20.

the injury nor the tortious conduct occurred in the United States.  The Supreme Court held the

FSIA's tort exception "covers only torts occurring within the territorial jurisdiction of the United

States."  *Id*.

Because plaintiff's negligence claim against the Holy See is supported in part by

allegations of action or omission located in Rome, accepting the Holy See's interpretation would

compel the conclusion that the exception does not apply.  However, *Amerada Hess* does not

require this result, and *Olsen* expressly forecloses it.  *Olsen*, 729 F.2d at 646.  Consistent with

the Ninth Circuit's holding in *Olsen*, the *Amerada Hess* decision makes the tortious activity

exception applicable to "torts occurring within the territorial jurisdiction of the United States."

*Id*.  In other words, as long as plaintiff alleges facts sufficient to show both the injury and the

conduct (action or inaction) giving rise to the tort occurred in the United States, the exception

applies.  Nowhere in *Amerada Hess* is the exception made inapplicable by plaintiff's allegations

of conduct or injury occurring outside of the United States but going to the same tort.  The Holy

See's reliance on *De Gruyter*, 822 F. Supp. at 677, and *Persinger*, 729 F.2d at 842, does not alter

this conclusion.

I read plaintiff's negligence claim against the Holy See as based on both the Holy See's

acts (retaining Ronan, placing him in Portland) and omissions (failure to provide reasonable

supervision, failure to use reasonable care in investigating, failure to warn).  Clearly, it is

difficult to pinpoint the site of an omission.  The Holy See's alleged failures could be said to

have occurred inside the Vatican where investigation would have occurred, or where warnings

could have been issued.  On the other hand, it is also possible to situate a failure to warn at the

location where such warning would have been heard – Portland, Oregon.  Actions are easier to

locate, and for purposes of the "in the United States" analysis, I will focus on the Holy See's acts in evaluating whether there is "at least one entire" tort of negligence occurring in the United States. *See Olsen*, 729 F.2d at 646.

The question then becomes, did plaintiff allege a viable cause of action for the Holy See's negligence based on acts and injury occurring in the United States?  In Oregon, a plaintiff may establish negligence by either invoking a special status/relationship that defines defendant's duty, or by alleging defendant's conduct "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari*, 734 P.2d at 1336.  Here, plaintiff alleged the Holy See knew or should have known of Ronan's dangerous propensities, Compl. ¶ 39, and despite such knowledge, acted negligently by placing Ronan in St. Albert's in Portland. *Id*. at ¶ 13.  This placement occurred entirely within the United States because Ronan was transferred from Chicago to Portland.  Certainly, plaintiff's injuries, including his emotional pain, dysfunction, embarrassment, and other psychological injuries, occurred entirely within the United States.  Therefore, I find plaintiff has alleged a claim for negligence based on acts and injuries occurring entirely in the United States.  *See G.B. v. Archdiocese*, 2002 WL 31441220 at *6 ("an employer who has knowledge of an employee's predilection to sexually abuse young boys unreasonably creates a foreseeable risk by allowing the employee uninhibited access to young boys.").  This result is not changed by the fact that plaintiff's complaint alleges many other bases of tortious conduct by the Holy See possibly occurring outside of the United States. *See Olsen*, 729 F.2d at 646 (the exception does not require every aspect of the sovereign's allegedly tortious conduct to occur in the United States).

PAGE 42 - OPINION AND ORDER

(b)    Is plaintiff's negligence claim against the Holy See barred by the discretionary function exception?

The Holy See argues it is entitled to the safe harbor provided by the discretionary function exception to the tortious activity exception.  This safe harbor dictates that a court does not have jurisdiction over a foreign sovereign for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  28 U.S.C. § 1605(a)(5)(A).  "The existence of the discretionary function [exception] under the FSIA is generally analyzed under the principles developed pursuant to the Federal Tort Claims Act's ("FTCA") discretionary function exception."  *Joseph*, 830 F.2d at 1026; *see* House Report at 21.  Both parties agree the Holy See's entitlement to this safe harbor is determined by way of a two-part test.  *See United States v. Gaubert*, 499 U.S. 315, 322 (1991) (interpreting FTCA's discretionary function exception).  First, the court must determine whether the challenged action is "discretionary in nature" or "involve[s] an element of judgment or choice."  *Guabert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536).  Second, even assuming the challenged action involves discretion, the court must determine "whether the judgment is of the kind that the discretionary function exception was designed to shield."  *Id.* (internal quotation marks and citation omitted).

(i)    Whether the challenged action was discretionary.

Analyzing the first prong in this case is straightforward.  The court must determine whether the Holy See failed to follow a mandatory rule or policy in relation to the actions challenged in this case.  *Berkovitz*, 486 U.S. at 536.  If so, its actions were not "discretionary in nature" and the discretionary function exception does not apply.  *Id.*  Plaintiff has not alleged the Holy See failed to follow a specific mandatory rule or church canon.  Thus, the applicability of

the discretionary function exception depends on the second prong.  Pl.'s Resp. at 19-21.

> (ii) Whether the challenged action is the type of judgment that the discretionary function exception is designed to shield.

In analyzing the second prong of the discretionary function exception, "the question of *how* the government is alleged to have been negligent is critical."  *Whisnant v. United States*, 400 F.3d 1177, 1185 (9th Cir. 2005) (emphasis in original).  In *Whisnant*, the district court erroneously treated plaintiff's claim as one of government negligence in engaging or hiring a contractor to perform maintenance work at a naval base commissary.  *Id*. at 1184.  In fact, plaintiff's complaint alleged the government "ignored reports and complaints describing the unsafe condition of the meat department, knew or should have known of the dangerous condition, and intentionally or recklessly or both intentionally and recklessly permitted employees and customers to work and shop at the commissary in spite of the health hazards."  *Id*. at 1185.  In applying the discretionary function exception, the Ninth Circuit focused on plaintiff's specific allegations that the government "negligently ignored health hazards that were called to its attention," and held this alleged conduct, as opposed to a generalized claim of negligent hiring or negligently designing regulations, was not protected under the discretionary function exception.  *Id*. at 1185.

*Whisnant* is instructive here.  The Holy See attempts to characterize plaintiff's negligence claim as one for "negligent hiring or supervision."  Def.'s MTD at 22-23.  When viewed at this level of generality, it seems clear the Holy's See's employment decisions would satisfy the second prong.  *See, e.g.*, *Burkhart v. Washington Metro Area Transit Auth*., 112 F.3d 1207, 1217 (D.C. Cir. 1997) ("decisions concerning the hiring, training, and supervision of [Metro Transit] employees are discretionary"); *Gustav-Schmidt v. Chao*, 226 F. Supp. 2d 191, 197-98 (D. D.C.

2002) ("hiring decisions of a public entity require considerations of numerous factors, including budgetary constraints, public perception, economic conditions, individual backgrounds, office diversity, experience, and employer intuition."); *English v. Thorne,* 676 F. Supp. 761, 764 (S.D. Miss. 1987) (where plaintiff sued the Vatican for negligent hiring, retention and reassignment of a sexually abusive priest, the discretionary function exception barred those claims because, "as to the Vatican, the complaint appears to be an attempt to challenge the policies and/or procedures utilized by the Vatican in instructing or ordaining its priests, matters which are undeniably of a policy-making nature and clearly discretionary functions.").  However, in light of *Whisnant*, this court will not accept the Holy See's rather generic characterization of plaintiff's allegations.  400 F.3d at 1184-85.

According to plaintiff's complaint, the Holy See either knew or should have known that Ronan admitted to sexually molesting one minor in Benburb, after which he was transferred to Chicago where he admitted to sexually molesting three more minors.  Compl. ¶ 11-12.  Then, "despite such knowledge, [the Holy See] negligently retained Ronan and failed to warn those coming into contact with him" about his dangerous propensities.  *Id*. at ¶ 39.  In this way, Ronan was "able to assume positions of trust and authority as a Roman Catholic priest, where he was able to commit the wrongful acts against the plaintiff."  *Id*.  With the challenged conduct thus framed, the question under the second prong is whether the Holy See was making the kind of policy judgment the exception was meant to protect when, without warning parishioners of the known danger, it placed a priest it knew to be a child-molester in a position in which, for the third time, he would have private access to minors.  I conclude this challenged action is not the type of judgment the discretionary function exception is designed to shield.

In general, a sovereign's failure to warn of a known danger is not the type of policy-based decision the discretionary function exception was designed to shield.  *See Oberson v. U.S. Dep't of Agric.*, 441 F.3d 703, 710-12 (9th Cir. 2006); *Whisnant*, 400 F.3d at 1185.  At issue in *Oberson* was whether the Forest Service's failure to post a warning for snowmobilers at an abrupt decline in a trail grade is the type of judgment protected by the discretionary function exception.  441 F.3d at 710-11.  Central to the court's holding that this failure to warn is not protected was the fact that the Forest Service "knew of the hazard through its own investigation, which disclosed that sixteen days prior to [the plaintiff's] accident[,] the hill in question had been the site of a *potentially* serious collision between a snow grooming machine and two snowmobiles." *Id.* at 712 (emphasis added).  Even though the hazard at issue had not yet caused injury, the Forest Service's knowledge of the hazard's potential to cause injury was sufficient to remove its failure to warn from the safe harbor afforded by the discretionary function exception. *Id.*  Similary, in *Whisnant*, where the agency had notice of a health hazard via safety inspection reports showing the accumulation of mold in the meat department of a commissary, "the government's failure to control the accumulation of toxic mold . . . cannot be protected under the discretionary function exception."  400 F.3d at 1185.

When the government or agency is responsible for creating the danger or exposing the public to a hazard that otherwise would not exist, the failure to warn of the known danger is not the type of judgment the discretionary function was designed to shield.  *Sutton v. Earles*, 26 F.3d 903, 910 (9th Cir. 1994).  In *Sutton*, the Navy failed to warn boaters of "an obstruction to navigation that the Navy itself placed in navigable waters that the Navy knew to be traversed by pleasure boat traffic." *Id.* at 911.  The court found this conduct fell outside the realm of

decisions protected by the discretionary function exception because "[a] decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic or political policy decision that the discretionary function exception is intended to protect." *Id*. at 910.

Additionally, "[fa]ilure to act after notice of illegal action does not represent a choice based on plausible policy considerations." *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995). In *Tonelli*, postal patrons brought an FTCA lawsuit asserting claims of negligent hiring, retention, and supervision against the United States for its continued employment of workers it knew had violated postal laws. *Id*. at 494. The United States argued the claims were barred by the discretionary function exception. The Eighth Circuit, acknowledging that in general, issues of employee supervision and retention involve the exercise of policy judgment, held the discretionary function exception inapplicable because "this action involves allegations that the post office failed to act when it had notice of illegal behavior." *Id*. at 496.

In sum, *Oberson*, *Whisnant*, *Sutton*, and *Tonelli*, support plaintiff's argument that when the Holy See failed to warn parishioners, after notice of Ronan's illegal conduct in sexually molesting four minors, this was not a choice based on plausible policy considerations for which the Holy See is entitled to immunity under the discretionary function exception. Plaintiff's complaint adequately alleges the Holy See knew or should have known of Ronan's dangerous propensities because Ronan openly admitted to his superiors that he sexually molested at least four minors. Pl.'s Compl. ¶ 11 ("According to files and records maintained by the Roman Catholic Church, Ronan was removed from Benburb due to his admissions."). Not only did plaintiff allege the Holy See knew of the danger, but he also alleges the Holy See was

responsible, at least in part, for transferring the known danger to Portland, thus exposing parishioners to this hazard. *See Sutton*, 26 F.3d at 910. Placement of a known child molester in a Portland parish, where he would have unlimited access to young boys for the third time, without warning the new parishioners, is not the kind of discretionary act that the exception is meant to immunize.

This court is mindful of the fact that in certain situations, a failure to warn may qualify as the type of judgment the discretionary function exception was designed to shield; this is true where the failure to warn is a policy-based decision and represents a balancing of competing interests. *See Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) (discretionary function exception does shield agency's failure to post warning signs alongside potentially hazardous stream where the "challenged conduct implicates a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards."); *Alfrey v. United States*, 276 F.3d 557, 565 (9th Cir. 2002) (discretionary function exception is designed to shield prison official's "judgment about how extensively to search a cell [because the decision] involves a balancing of the potential risk . . . against the inmate's interest in being free from overly intrusive searches"); *Gordon v. Ottumwa Cmty. Sch. Dist.*, 115 F. Supp. 2d 1077, 1088-89 (S.D. Iowa, 2000) (school district entitled to discretionary function exception for retaining an alleged abuser because the record contained evidence of the school's balancing of competing policy interests of public safety and fairness to the accused).

The challenged action in this case is not the type of judgment the discretionary function exception is designed to shield because the record is devoid of any evidence that the Holy See's

failure to warn was the result of a policy judgment or was even susceptible to balancing competing policy interests. *Valdez*, 56 F.3d at 1180. Nor does the Holy See advance any policy justification for its action or inaction. *See, e.g., O'Toole v. United States*, 295 F.3d 1029, 1036 (9th Cir. 2002) ("Because the [government] advances no other reason for its actions or inactions aside from the choice to spend its limited funds in other ways, the discretionary function exception does not apply."); *Oberson*, 441 F.3d at 712 ("In the absence of any evidence that the failure to post a warning or remedy the hazard was the product of a policy choice, we conclude that the discretionary function exception did not shield the Forest Service from liability.").

The Holy See failed to offer any evidence or argument that the challenged action, as opposed to personnel decisions in general, is somehow susceptible to policy analysis or is grounded in social, economic or political policy. The Holy See's failure in this regard is attributable, at least in part, to its litigation strategy in mounting a facial, rather than factual, attack to plaintiff's complaint. In the absence of any justification or explanation, the court finds the Holy See did not meet its burden to demonstrate the applicability of the discretionary function exception. *See Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1213 (9th Cir. 2001). Under the formulation of the Holy See's action currently challenged before the court, the Holy See's failure to warn parishioners of a known danger the Holy See itself transplanted into a Portland parish is not susceptible to policy analysis. Therefore, it is not the type of judgment the discretionary function exception was designed to shield and this court has subject matter jurisdiction over plaintiff's negligence claim against the Holy See.

IV.   CONCLUSION

The Holy See's motion to dismiss (#133) for lack of subject matter jurisdiction is

DENIED.  The commercial activity exception to the FSIA is inapplicable because the gravamen

of plaintiff's complaint is not commercial in nature.  However, plaintiff's complaint contains

factual allegations sufficient to establish the applicability of the tortious activity exception to the

FSIA such that plaintiff survives the Holy See's facial attack in this motion to dismiss.

Moreover, because the challenged conduct is not the type of judgment the discretionary function

exception was designed to shield, and because the record is devoid of any policy-based rationale

for the challenged conduct, the Holy See did not meet its burden to demonstrate its entitlement to

the safe harbor under the tortious activity exception to sovereign immunity.


IT IS SO ORDERED.

DATED this   7th   day of June, 2006.

                                        /s/ Michael W. Mosman_____
                                        MICHAEL W. MOSMAN
                                        United States District Court