William A. Barton, OSB No. 72020
Kevin K. Strever, OSB No. 85339
BARTON & STREVER, P.C.
P.O. Box 870
Newport, OR 97365
Telephone: (541) 265-5377
Facsimile: (541) 265-5614
E-Mail: attorneys@bartonstrever.com

Jeffrey R. Anderson, MSB No. 2057
Michael G. Finnegan, MSB No. 033649X
*Admitted Pro Hac Vice*
JEFF ANDERSON AND ASSOCIATES, P.A.
366 Jackson Street, Suite 100
St. Paul, Minnesota 55101
Telephone: (651) 227-9990
Facsimile: (651) 297-6453
E-Mail: jeff@andersonadvocates.com
          mike@andersonadvocates.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| JOHN V. DOE,<br><br>    Plaintiff,<br><br> vs.<br><br>HOLY SEE, (State of the Vatican City), Its<br>Instrumentalities and/or Agents - Does 1-10;<br>ARCHDIOCESE OF PORTLAND IN OREGON,<br>an Oregon Corporation; THE ROMAN<br>CATHOLIC ARCHBISHOP OF PORTLAND IN<br>OREGON, and successors, a corporation sole,<br>dba THE ARCHDIOCESE OF PORTLAND<br>IN OREGON; THE CATHOLIC BISHOP OF<br>CHICAGO, a corporation sole; THE ORDER OF<br>THE FRIAR SERVANTS OF MARY, d/b/a<br>THE ORDER OF THE FRIAR SERVANTS OF<br>MARY, U.S.A., PROVINCE, INC.,<br><br>    Defendants. | Case No.: CV 02 430 MO<br><br>**SECOND AMENDED<br>COMPLAINT**<br><br><br>**TRIAL DEMANDED** |

EXHIBIT A

Plaintiff, for his causes of action against Defendants, alleges that:

## PARTIES

### 1.

Plaintiff John V. Doe is an adult male citizen of the State of Washington.  Plaintiff was a minor at the time of all sexual abuse alleged below.

### 2.

At all times material, Defendant Holy See (State of the Vatican City), (hereinafter "Holy See") is a foreign country.  The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1-10 are unknown to Plaintiff who therefore sues said Defendants by such fictitious names.  When the true names and capacities of said Defendants have been ascertained, Plaintiff will seek leave of court to amend this complaint to allege the true names and capacities.  Plaintiff is informed and believes and based thereon alleges that each of the Defendants, as an agent and/or instrumentality of Defendant Holy See, designated as a Doe herein is liable in some manner for the acts, occurrences and omissions hereinafter alleged.  Any reference or allegation against Defendant Holy See includes Does 1 through 10.

### 3.

Defendant Holy See is the ecclesiastical, governmental, and administrative capital of the Roman Catholic Church.  Defendant Holy See is the composite of the authority, jurisdiction, and sovereignty vested in the Pope and his delegated advisors to direct the world-wide Roman Catholic Church.  Defendant Holy See has unqualified power over the Catholic Church including each and every individual and section of the church.  Defendant Holy See directs, supervises, supports, promotes and engages in providing religious and pastoral guidance, education and

counseling services to Roman Catholics world-wide in exchange for all or a portion of the revenues derived from its members for these services.  The Holy See engages in these activities through its agents, cardinals, bishops and clergy, including religious order priests, brothers and sisters, who engage in pastoral work under the authority of its bishop.  The Holy See actively engages in commercial activity in the United States by collecting contributions from the faithful. Moreover, Doe's claims are based on his perpetrator's commercial employment relationship with the Holy See and its agents. The relevant employment relationship is not peculiar to a sovereign as the employment is not part of civil service, the diplomatic corps, or the military.

Defendant Holy See's business operation performs extensive financial operations and fundraising activities throughout the United States.  Consistent with its corporate structure, Defendant Holy See has instituted worldwide, mandatory policies that perpetuate its financial strength and stability

As part of its fundraising activities, the Holy See has continued the long tradition of Peter's Pence.  Peter's Pence fundraising for the Holy See has been active since 1871 when it was created by the "Saepe Venerabilis" encyclical authored by Pope Pius IX.  Members are encouraged to send their donations throughout the year directly to the Office of the Holy Father in Vatican City, but the Holy See also directs and coordinates an international campaign each and every year on June 29 or the closest Sunday to the Solemnity of Saints Peter and Paul to take up a specific collection for the benefit of the Holy See. Http://www.vatican.va/roman_curia/secretariat_state/obolo_spietro/documents/index_en.htm (last visited July 9, 2009).

Peter's Pence raises funds that are required to be sent directly to the Holy See.   Dioceses are ordered to send the funds directly to "His Holiness Pope Benedict XVI, 00120, Vatican City

State – Europe." As part of Peter's Pence, the Holy See is involved in the United States in creating and benefits directly from solicitation letters sent to members of its organization throughout the United States. It is also directly involved in and authorizes and supports appeals at parishes throughout the United States for members to give money to the Holy See and the creation and distribution of materials to help its agents recruit funds for the Peter's Pence Collection. The Holy See also uses other forms of media such as ads and posters to solicit funds in the United States.

On information and belief the Peter's Pence operation has provided the Holy See with millions of dollars each year from the United States. The Peter's Pence collection brought in almost $80 million dollars for the Holy See in 2007 and over $100 million in 2006, with the United States providing the largest percentage of the funds. The Holy See's business divisions in the United States facilitate the largest portion of money collected for the Holy See in the Peter's Pence Collection.

As part of its business operation Defendant Holy See requires its agents in charge of its operation in a particular geographical location to come to Rome and report about the state of the Holy See's operations, including any problems involving financial status and business issues. The Holy See calls these Ad Limina visits. These agents, as appointed leaders of the local business operations including those in the United States, are required to make this visit at least once every five years. As part of its business operation, the Holy See also requires its divisions to write detailed reports about the status of the operation including but not limited to personnel issues, finances, and real estate holdings. With respect to the income of pastors and their supervisors, the Holy See requires information regarding whether it is from real estate, public

funds, an uncertified sum accruing through individual stole fees, or from a contribution made by the faithful or by the diocese.  These reports are sometimes called "quinquennial reports."

The Holy See has direct involvement with seminaries in the United States including Oregon, where it trains agents in its operation. On August 15, 1990, Pope John Paul II issued an apostolic constitution on Catholic higher education entitled *Ex corde Ecclesiae*. The Apostolic Constitution described, in detail, the relationship between the Holy See and its educational institutions like seminaries.  According to the Catholic Church Extension Society,

> No matter where it's located or how it's structured, every institution answers to the Holy See. The Vatican's Congregation for Catholic Education has jurisdiction over all Catholic institutions of higher learning, including seminaries. As a result, it oversees the admissions requirements and curricula to ensure that candidates are properly prepared. In addition, since 1971, U.S. seminaries have adhered to the Program of Priestly Formation (PPF) promulgated by the U.S. bishops' confer-ence and also approved by Rome.

Inside the Seminary,  http://www.catholicextension.org/site/epage/54472_667 (last visited July 10, 2009).  The Holy See has a vast enterprise in the United States which recruits and solicits members in order to support its business operations in the United States and worldwide.

Defendant Holy See is solely responsible for creating new divisions of its business enterprise (called a "Diocese") around the world. Only the Holy See has this power. The Holy See created both the Archdiocese of Portland and the Diocese of Baker. It creates, divides and re-aligns dioceses, archdioceses and ecclesiastical provinces see comment.  It also gives final approval to the creation, division or suppression of provinces of religious orders and it is solely responsible for modification or elimination of one of the divisions of its business enterprise. Defendant Holy See reserves the exclusive right to perform numerous local activities within its business operation within the United States including but not limited to marriage annulments, marriage dissolutions, Pius Wills, laicization of clerics, dispensations from canon law, and

appeals of a bishop's decision. The Holy See has control over and involvement with property owned by the Archdiocese of Portland, the Diocese of Baker, and the Society of Jesus (Oregon Province). The Holy See's permission is required for the alienation (sale, gift, etc.) of much of the property owned by the Archdiocese of Portland, the Diocese of Baker, and the Society of Jesus (Oregon Province). Can. 1292 ß2 ("The permission of the Holy See also is required for the valid alienation of goods whose value exceeds the maximum sum, or if it is a question of the alienation of something given to the Church by reason of a vow, or of objects which are precious by reason of their artistic or historical significance."); Can. 1296 ("When alienation has taken place without the prescribed canonical formalities, but is valid in civil law, the competent authority must carefully weigh all the circumstances and decide whether, and if so what, action is to be taken, namely personal or real, by whom and against whom, to vindicate the rights of the Church.").

Defendant Holy See directly controls the standards, morals, and obligations of the clergy of the Catholic Church.  Defendant Holy See also does this by and through its agents and instrumentalities, including the Congregation for the Clergy and the Congregation for Religious both delegated by the Pope and acting on his behalf.  Defendant Holy See interacts with its local business units including those in the United States in a manner that controls their day-to-day business and provides for no discretion on numerous issues.  The Holy See routinely promulgates its policies through various means including encyclical, canon law, and Papal pronouncements.

Defendant Holy See promotes the sacred liturgy, directs and coordinates the spreading of its faith and other things necessary to promote the faith.  It creates, appoints, assigns and re-assigns bishops, superiors of religious orders, and through the bishops and superiors of religious

orders has the power to directly assign and remove individual clergy.  All bishops, clergy, and priests, including religious order priests, vow to show respect and obedience to the Pope and their bishop.

Defendant Holy See also examines and is responsible for the work and discipline and all those things which concern bishops, superiors of religious orders, priests and deacons of the religious clergy.  In furtherance of this duty, Defendant Holy See requires bishops to file a report, on a regular basis, outlining the status of, and any problems with clergy.  Defendant Holy See promulgates and enforces the laws and regulations regarding the education, training and standards of conduct and discipline for its members and those who serve in the governmental, administrative, judicial, educational and pastoral workings of the Catholic church world-wide. Defendant Holy See is also directly responsible for removing superiors of religious orders, bishops, archbishops and cardinals from service and/or making them ineligible for positions of leadership in the various divisions and offices of the Catholic church.

The Holy See has established exclusive policies and standards that dictate how sexual abuse of children by its employees will be handled.  With respect to this aspect of its employment policy and business, the Holy See mandates certain procedures and absolute secrecy by all involved on pain of immediate removal from the organization (excommunication), retains the power at all times to conduct the inquisition of the case itself, and admits no deviations from its mandate.  Through its mandated policies, the Holy See is an integral part of the day-to-day handling of cases of child sex abuse by clergy.

In 1962, the Holy See released the confidential document, <u>Instruction on The Manner of Proceeding in Cases of Solicitation</u>, (The Vatican Press, 1962), available at http://www.scribd.com/doc/8690038/The-1962-Vatican-Document-on-Clergy-Sexual-Abuse

(The heading of the document says "From the Supreme and Holy Congregation of the Holy Office To All Patriarchs, Archbishops, Bishops and Other Diocesan Ordinaries 'Even of the Oriental Rite'") (Hereinafter referred to as "*Crimen Sollicitationis*"), which is a document containing mandatory instructions regarding the handling of child sex abuse by clergy.  It permits no discretion in the handling of such cases.  According to the document itself, it is an "instruction, ordering upon those to whom it pertains to keep and observe it in the minutest detail."  *Crimen Sollicitationis* at paragraph 24.

**4.**

At all times material, Defendant Archdiocese of Portland in Oregon, was a citizen of the state of Oregon in that it is a corporation incorporated under the laws of the state of Oregon and having its principal place of business in the state of Oregon.  At all times material, the Roman Catholic Archbishop of Portland in Oregon, and successors, was a citizen of the state of Oregon in that it is a corporation incorporated under the laws of the state of Oregon and having its principal place of business in the state of Oregon and doing business as the Archdiocese of Portland in Oregon (hereinafter, collectively the "Archdiocese").  Defendant Archdiocese provided pastoral services to Plaintiff and his immediate family through its parishes.

**5.**

At all times material, Defendant Catholic Bishop of Chicago (hereinafter "Catholic Bishop") was and continues to be a citizen of the state of Illinois in that it is a corporation incorporated under the laws of the state of Illinois and having its principal place of business in the state of Illinois.

**6.**

At all times material, Defendant The Order of the Friar Servants, d/b/a The Order of the

Friar Servants of Mary, U.S.A., Province, Inc. (hereinafter "Order") was and continues to be a citizen of the state of Illinois in that its principal place of business is in the state of Illinois and operating world-wide, including Benburb, Ireland, Chicago, Illinois and Portland, Oregon with its main headquarters in Italy. Defendant Order is known as a religious Order "Of Pontifical Right" which means that it is under the ultimate authority of Defendant Holy See and not a diocesan bishop. The head of an order, including Defendant Order, is called the Master General or the equivalent. His office is in Rome. He is elected but his election is approved by Defendant Holy See. The individual provinces of an order are headed by provincials who are elected by their members and approved by the head of the order. For an order, such as Defendant Order, and its priests to operate within a diocese, it must obtain the approval of the local bishop within that diocese or area.

## JURISDICTION AND VENUE

### 7.

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the Plaintiff herein, a citizen of the state of Washington, is diverse in state citizenship from Defendants, citizens of the states of Oregon and Illinois, and a foreign country.

### 8.

This Court has personal jurisdiction over the Defendants because a tort was committed by the Defendants against Plaintiff in this district. This Court has jurisdiction over the Defendant Holy See and/or Does 1-10 in that the actions that the Plaintiff complains of involve an activity for which the law provides an exception to sovereign immunity.

**9.**

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred within this district.

**FACTS**

**10.**

At all times material, Defendants employed priests, including one Father Andrew Ronan ("Ronan"), to provide religious and pastoral services. Father Ronan's duties were limited to performing ecclesiastical and parochial services. At no time did he perform legislative work or governmental functions on behalf of the Holy See and was not a civil servant or diplomatic or military employee of the sovereign Holy See. Father Ronan was employed by all Defendants as a priest. The duties of Ronan's employment included but were not restricted to teaching the word of God and the law of the church, providing religious, educational, and counseling services, and obtaining financial support for the Church. Each Defendant controlled Ronan, was responsible for punishment, and had some stake in paying Ronan for his services. Defendant Holy See had the sole authority to remove Ronan from his position as a priest. At all times material, Ronan was a Roman Catholic priest, employed by and an agent of Defendant Holy See and Defendant Order, under their direct supervision and control. Ronan was a Roman Catholic priest and employee of Defendant Catholic Bishop from on or about 1961-1965 and Defendant Archdiocese of Portland, from on or about 1965 to 1966. As a Roman Catholic priest, Ronan was under the direct supervision, employ and control of Defendant Archdiocese and Defendant Catholic Bishop. At all times material, Ronan was an adult at the time of the sexual abuse alleged herein. As a Religious Order priest, Ronan was under the supervision of both the superiors of his order and the bishops of dioceses wherein he was serving.

**11.**

In approximately 1955/1956, while employed with Defendant Archdiocese of Armagh, at Our Lady of Benburb, Priory, Ireland, Ronan sexually molested a youth. The parents of the youth and/or the youth reported the abuse and left it up to those at Benburb to deal with Ronan. On information and belief, Ronan admitted to abusing the youth. According to files and records maintained by the Roman Catholic Church, Ronan was removed from Benburb due to his admissions. Moreover, in the same files and records, Ronan admitted that this problem went back to his early life, and even though he overcame it for many years, it was still deeply rooted within him. Again, according to the same records and files, Ronan was never to be trusted.

A government-generated in-depth report that investigated and analyzed the sexual abuse of minors by clergy in Ireland revealed that the Catholic Church had a systematic problem of clergy sexually abusing youth. The report made several conclusions including but not limited to: Cases of sexual abuse were managed with a view to minimizing the risk of public disclosure and consequent damage to the institution; the offenses were not reported to the police; the recidivist nature of sexual abuse was known to religious authorities; the Church authorities knew that the sexually abusing clergy were often long-term offenders who repeatedly abused children wherever they were working; When confronted with evidence of sexual abuse, a standard response of the religious authorities was to transfer the offender to another location where, in many instances, he was free to abuse again; sexual abuse was endemic in boys' institutions http://www.childabusecommission.com/rpt/04-06.php (last viewed July 14, 2009). Each Defendant, including the Holy See, was an active participant and mandated the policies that led to these horrific occurrences in Ireland.

Also during this time Defendant Holy See was involved in the formation of secret facilities in the United States where sexually offending clergy would be sent for a short period. In 1962, Fr. Gerald Fitzgerald was in communication with Defendant Holy See.  At the request of the prefect, Cardinal Alfredo Ottaviani, one of the Holy See's officials, he prepared a report dated April 11, 1962.  In this report he discussed the various types of sexual problems of priests, including sexual abuse of minors: "On the other hand, where a priest for many years has fallen into repeated sins which are considered, generally speaking, as abnormal (abuse of nature) such as homosexuality and most especially the abuse of children, we feel strongly that such unfortunate priests should be given the alternative of a retired life within the protection of monastery walls or complete laicization."

In 1963 Fr. Gerald had a private audience with Pope Paul VI (1963-1978) and on August 27, 1963 submitted a report to the pope at the pope's request.  Concerning priests who sexually abuse minors he said to the pope: "Problems that arise from abnormal, homosexual tendencies are going to call for, not only spiritual, but understanding psychiatric counseling.  Personally I am not sanguine of the return of priests to active duty who have been addicted to abnormal practices, especially sins with the young.....Where there is indication of incorrigibility, because of the tremendous scandal given, I would most earnestly recommend total laicization." Defendants, including the Holy See, chose to keep this a secret under its long standing policy to avoid scandal at all costs.   At this point the Holy See knew that it had a widespread problem of its clergy sexually molesting minors, including in the United States, and it authorized, facilitated and participated in the creation of these facilities in the United States where sexually offending clergy could go before they were moved to another parish to work and potentially abuse again.

**12.**

In approximately 1963-1964, Ronan was removed from Benburb and placed in Defendant Catholic Bishop, in Defendant Order's Chicago province, at St. Philip's High School, an all boys high school.  While at St. Philip's High School, Ronan molested at least three male students. Each report was made independent of the other.   When Ronan was confronted with the allegations, he admitted to abusing the youths.  According to files and records maintained by the Roman Catholic Church, when confronted, Ronan admitted that he did not understand why he was assigned to work at a boys' high school in a counselor's private office, where temptation to molest children would be maximized, given his previous record of molestation in Benburb. Upon information and belief, Defendant Catholic Bishop, acting in accordance with the policies, practices, and procedures of Defendant Holy See, failed to remove or discipline Ronan, or to warn others, including Defendant Archdiocese, of Ronan's propensities.

Defendant Holy See's policy of secrecy under penalty of immediate removal from the organization (excommunication) for all involved in an accusation against clergy for the crime of solicitation – which includes sexual abuse of a minor – created a shroud of secrecy insulating Ronan from consequence. This policy is explicitly laid out in the 1962 Vatican secret document, *Crimen Sollicitationis*. Which specifies, in paragraph 4, that although the penalty for a Church member who violates the vow of secrecy regarding child sex abuse by clergy is usually excommunication, extreme cases can also result in removal from ministry or "They [the Ordinary, or controlling agent] will also be able to transfer him to another [assignment], unless the Ordinary of the place has forbidden it because he has already accepted the denunciation and has begun the inquisition."   Through this policy and others the Holy See knowingly allowed, permitted and encouraged child sex abuse by its priests, including Ronan.

**13.**

Despite knowing of Ronan's dangerous propensities to abuse children, in approximately 1965, Defendant Holy See and Defendant Order placed Ronan in Defendant Archdiocese at St. Albert's Church in Portland, Oregon.  This action allowed, permitted and encouraged Ronan to molest additional children, including Plaintiff.  Plaintiff came to know Ronan as his priest, counselor and spiritual adviser.  Plaintiff was raised in a devout Roman Catholic family, and regularly celebrated mass, received the sacraments, participated in church-related activities. Plaintiff, therefore, developed great admiration, trust, reverence and respect for the Roman Catholic Church and its agents.  Thus, Ronan was a person of great influence and persuasion as a holy man and authority figure.

**14.**

As a result of representations made by Defendants Holy See, Archdiocese, Catholic Bishop, and Order (hereinafter "Defendants") and by virtue of the fact that Defendants held themselves out as the counselors and instructors on matters that were spiritual, moral and ethical, Defendants had domination and influence over Plaintiff.  Defendants, by maintaining and encouraging such a relationship with Plaintiff, entered into a fiduciary relationship with Plaintiff. In addition, by accepting the care, custody and control of the minor Plaintiff, Defendants stood in the position of an *in loco parentis* relationship with the minor Plaintiff.  As a result of these special relationships between Plaintiff and Defendants, Plaintiff trusted and relied upon Defendants to nurture and protect him while he was in Defendants care and custody.  The power imbalance between Defendants and Plaintiff increased the young boy's vulnerability to Ronan.

**15.**

In late 1965 or early 1966, when Plaintiff was approximately 15 to 16 years old, Ronan,

using his position of authority, trust, reverence, and control as a Roman Catholic priest, engaged in harmful sexual contact upon the person of Plaintiff on repeated occasions.  The sexual contact occurred in several places including the monastery and surrounding areas in Portland, Oregon, United States of America.

**16.**

The sexual abuse of Plaintiff, and the circumstances under which the abuse occurred caused Plaintiff to develop various psychological coping mechanisms and symptoms of psychological distress, including great shame, guilt, self-blame, depression, repression and disassociation.  As a result, Plaintiff was unable to perceive or know the existence or nature of his psychological and emotional injuries and their connection to the sexual abuse perpetrated upon him by Ronan.

**17.**

As a direct result of the sexual abuse and wrongful conduct described herein, Plaintiff has suffered and will continue to suffer severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, and other psychological injuries; was prevented and will continue to be prevented from performing his normal daily activities and obtaining the full enjoyment of life; has incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling; and has incurred and will continue to incur loss of income and loss of earning capacity.

**COUNT I:  VICARIOUS LIABILITY (RESPONDEAT SUPERIOR) AGAINST DEFENDANT ARCHDIOCESE FOR THE ACTS OF THEIR AGENT RONAN**

Plaintiff incorporates each and every allegation contained in Paragraphs 1 through 17 of this complaint as if set forth in full herein.

**18.**

For the purpose of furthering his assigned duties as priest and pastor, Ronan identified Plaintiff's family as one with a young male child, sought and gained the trust and confidence of Plaintiff's mother as friend, spiritual guide, youth pastor, confessor, and priest; sought and gained parental consent for Plaintiff to participate in counseling and other activities, and to spend time alone with him; and sought and gained the parental directive to Plaintiff that he respect Ronan's authority and guidance and comply with his instruction.

**19.**

For the purpose of furthering his assigned duties as priest and pastor, Ronan also sought and gained Plaintiff's trust, friendship, admiration, and obedience.  As a result, Plaintiff was conditioned to comply with Ronan's direction and to look to him as an authority on matters spiritual, moral, ethical and temporal.

**20.**

Ronan at all materials times suffered from a mental disorder known as Pedophilia.  This disorder caused him to be compelled to perpetrate sexual acts upon young boys.  Using the power, authority and trust of his position as priest and youth pastor to Plaintiff and to his parents, Ronan enticed, induced, directed, and coerced Plaintiff to engage in various sexual acts with him. Ronan's sexual molestation of Plaintiff occurred on multiple occasions over a period of several months.

**21.**

Using the power, authority and trust of his position as priest and youth pastor to the Plaintiff and to his parents, Ronan enticed, induced, directed and/or coerced Plaintiff to engage in various sexual acts with him from approximately 1965 to 1966.  Defendant Archdiocese is

therefore vicariously liable for the negligent acts and omissions of their agent Ronan.

**22.**

As a direct result of this sexual abuse and breach of trust, Plaintiff has suffered and will continue to suffer emotional pain and dysfunction to Plaintiff's general damage in an amount to be determined by a jury in excess of $75,000.

**23.**

As a further result of the molestation, Plaintiff has incurred and/or will continue to incur costs for counseling and psychological treatment in an amount to be disclosed prior to trial, and has lost earning capacity in an amount to be disclosed prior to trial.

**COUNT II:  NEGLIGENCE AGAINST DEFENDANT CATHOLIC BISHOP**

Plaintiff incorporates each and every allegation contained in Paragraphs 1 through 23 of this complaint as if set forth in full herein.

**24.**

Defendant Catholic Bishop, by and through its agents, servants and employees, knew or reasonably should have known of Ronan's dangerous and exploitive propensities as a child sexual abuser and/or an unfit agent, and despite such knowledge, Defendant negligently retained Ronan and failed to warn those coming into contact with him, including but not limited to Defendant Archdiocese, Plaintiff herein and Plaintiff's family, of Ronan's propensities.  Ronan was therefore able to assume positions of trust and authority as a Roman Catholic priest, where he was able to commit the wrongful acts against the Plaintiff.  Defendant failed to provide reasonable supervision of Ronan, failed to use reasonable care in investigating Ronan and failed to provide adequate warning to Plaintiff and his family.  Although the decision not to warn about Ronan's propensities was made outside the United States, the result had a direct effect in the

United States – namely, the sexual abuse of Doe. Church members and clergy in both Ireland and Chicago were barred from warning others of Ronan's propensities as result of the Holy See's policy embodied in the Vatican's 1962 document, *Crimen Sollicitationis*. Had they done so, they would have immediately incurred *latae sententiae* excommunication, which is a stricter form of excommunication than its counterpart *ferendae sententiae* excommunication, since it occurs instantly, rather than requiring ecclesiastic intervention. Upon information and belief, Defendant Catholic Bishop was acting in accordance with the policies, practices, and procedures of Defendant Holy See.

**25.**

As a direct result of this negligent conduct, Plaintiff has sustained and continues to sustain the injuries and damages described above in paragraphs 17, 22 and 23.

**COUNT III: VICARIOUS LIABILITY (RESPONDEAT SUPERIOR) AGAINST DEFENDANT ORDER FOR THE ACTS OF THEIR AGENT RONAN**

Plaintiff incorporates each and every allegation contained in Paragraphs 1 through 25 of this complaint as if set forth in full herein.

**26.**

For the purpose of furthering his assigned duties as priest and pastor, Ronan identified Plaintiff's family as one with a young male child, sought and gained the trust and confidence of Plaintiff's mother as friend, spiritual guide, youth pastor, confessor, and priest; sought and gained parental consent for Plaintiff to participate in counseling and other activities, and to spend time alone with him; and sought and gained the parental directive to Plaintiff that he respect Ronan's authority and guidance and comply with his instruction.

**27.**

For the purpose of furthering his assigned duties as priest and pastor, Ronan also sought and gained Plaintiff's trust, friendship, admiration, and obedience. As a result, Plaintiff was conditioned to comply with Ronan's direction and to look to him as an authority on matters spiritual, moral, ethical and temporal.

**28.**

Ronan at all materials times suffered from a mental disorder known as Pedophilia. This disorder caused him to be compelled to perpetrate sexual acts upon young boys. Using the power, authority and trust of his position as priest and youth pastor to Plaintiff and to his parents, Ronan enticed, induced, directed, and coerced Plaintiff to engage in various sexual acts with him. Ronan's sexual molestation of Plaintiff occurred on multiple occasions over a period of several months.

**29.**

Using the power, authority and trust of his position as priest and youth pastor to the Plaintiff and to his parents, Ronan enticed, induced, directed and/or coerced Plaintiff to engage in various sexual acts with him from approximately 1965 to 1966. Defendant Order is therefore vicariously liable for the negligent acts and omissions of their agent Ronan.

**30.**

As a direct result of this sexual abuse and breach of trust, Plaintiff has sustained and continues to sustain the injuries and damages described above in paragraphs 17, 22 and 23.

**31.**

As a further result of the molestation, Plaintiff has incurred and/or will continue to incur costs for counseling and psychological treatment in an amount to be disclosed prior to trial, and

has lost earning capacity in an amount to be disclosed prior to trial.

## COUNT IV:  NEGLIGENCE AGAINST DEFENDANT ORDER

Plaintiff incorporates each and every allegation contained in Paragraphs 1 through 31 of this complaint as if set forth in full herein.

### 32.

Defendant Order, by and through its agents, servants and employees, knew or reasonably should have known of Ronan's dangerous and exploitive propensities as a child sexual abuser and/or an unfit agent, and despite such knowledge, Defendant negligently retained and failed to warn those coming into contact with him, including but not limited to Defendant Archdiocese, Plaintiff herein and Plaintiff's family, of Ronan's propensities.  Ronan was able to assume positions of trust and authority as a Roman Catholic priest, where he was able to commit the wrongful acts against Plaintiff.  Defendant failed to provide reasonable supervision of Ronan, failed to use reasonable care in investigating Ronan and failed to provide adequate warning to Plaintiff and his family.  Upon information and belief, Defendant Order was acting in accordance with the policies, practices and procedures of Defendant Holy See.

### 33.

As a direct result of this negligent conduct, Plaintiff has sustained and continues to sustain the injuries and damages described above in paragraphs 17, 22 and 23.

## COUNT V:  VICARIOUS LIABILITY (RESPONDEAT SUPERIOR) AGAINST DEFENDANT HOLY SEE

Plaintiff incorporates each and every allegation contained in Paragraphs 1 through 33 of this Complaint as if set forth in full herein.

### 34.

At all times material, Defendant Holy See had the right to control its agents, Defendant Catholic Bishop, Defendant Archdiocese, Defendant Order and Ronan.  At all times material, Ronan and Defendants Catholic Bishop, Archdiocese and Order, were the agents of Defendant Holy See, acting in furtherance of the purposes of the Defendant Holy See, doing the kind of acts they were engaged to perform, and were motivated, at least in part, to further the purposes of Defendant Holy See.

## 35.

Defendant Holy See, by and through its agents, granted Ronan faculties to perform as a Roman Catholic priest.  Defendant Holy See, by and through its agents, also certified and held Ronan out to the community of the faithful as a fit and competent agent of Defendant Holy See and a minister of Christ.  Ronan was acting as the agent in ministering to the community of the faithful, including performing sacraments, teaching the word of God and the law of the Church and providing aid, comfort and counseling, and obtaining financial support for the church.

## 36.

Plaintiff was molested by Ronan while Plaintiff was under the authority and influence of Ronan as a Roman Catholic priest which authority was granted to him by Defendant Holy See, Archdiocese and Order.  The molestation of the Plaintiff occurred while Ronan was acting in the scope of his employment, the agency relationship with Defendant Holy See, Archdiocese and Order and/or this conduct was committed within the apparent authority arising from this employment and/or agency.  Ronan was executing the very employment duties which he was assigned to perform.

## 37.

Therefore, due to the nature of the employment duties and, the vast disparity of power

that existed in this relationship, Defendant Holy See is liable for the negligent and/or wrongful conduct of its agents, including Defendant Catholic Bishop, Defendant Archdiocese, Defendant Order, and its priest Father Ronan as described in the causes of action herein under the law of vicarious liability, including the doctrine of respondeat superior.

**38.**

As a direct result of this sexual abuse and breach of trust, Plaintiff has sustained and continues to sustain the injuries and damages described above in paragraphs 17, 22 and 23.

## COUNT VI:  NEGLIGENCE AGAINST DEFENDANT HOLY SEE

Plaintiff incorporates each and every allegation contained in Paragraphs 1 through 38 of this complaint as if set forth in full herein.

**39.**

Defendant Holy See, by and through its agents, servants and employees, knew or reasonably should have known of Ronan's dangerous and exploitive propensities as a child sexual abuser and/or an unfit agent, and despite such knowledge, Defendant negligently retained Ronan and failed to warn those coming into contact with him, including but not limited to, Defendant Archdiocese, Defendant Bishop and Defendant Order, Plaintiff herein and Plaintiff's family, of Ronan's propensities.  Ronan was therefore able to assume positions of trust and authority as a Roman Catholic priest, where he was able to commit the wrongful acts against the Plaintiff.  Defendant Holy See failed to provide reasonable supervision of Ronan, failed to use reasonable care in investigating Ronan and failed to provide adequate warning to Plaintiff and his family.

The Holy See retains at all times the power over who conducts the "inquisition" that investigates claims regarding the "crime of solicitation." *Crimen Sollicitationis* at paragraph 2.

While it delegates power over such proceedings to its chosen agents, it retains the unilateral power at all times to "summon[] the case to itself."  *Id*. In addition, if it is unclear whether the "denounced person" is under the jurisdiction of any of the Holy See's agents, the 1962 document orders the agent with knowledge of the abuse to send the case "to the Supreme Holy Congregation of the Holy Office."  *Crimen Sollicitationis* at paragraph 31.

The Holy See specifically has carved out the treatment of child sex abuse by clergy from other employment issues, and governs it everyday and perpetually according to non-negotiable and mandatory standards that it first set into place in 1867 and then reiterated and elaborated in 1962 and 2001. The Holy See has defined the "worst crime" to be covered by its dictated procedures, standards, and mandatory treatment, as "any obscene, external act, gravely sinful, perpetrated in any way by a cleric or attempting by him with youths of either sex or with brute animals (bestiality)."  *Crimen Sollicitationis* at paragraph 73.

There is no latitude given to its agents in the handling of such cases:

What is treated in these cases has to have a greater degree of care and observance so that those same matters be pursued in a most secretive way, and, after they have been defined and gives over to execution, they are to be restrained by a perpetual silence. (Instruction of the Holy Office, February 20, 1867, n. 14), each and everyone pertaining to the tribunal in any way or admitted to knowledge of the matters because of their office, is to observe the strictest secret, which is commonly regarded as a secret of the Holy Office, in all matters and with all persons, under the penalty of excommunication *latae sententiae*, ipso facto and without any declaration [of such a penalty] having been incurred and reserved to the sole person of the Supreme Pontiff, even to the exclusion of the Sacred Penitentiary, are bound to observe [this secrecy] inviolably.

*Crimen Sollicitationis* at paragraph 11.

Defendant Holy See mandated secrecy for all those involved, including agents and itself, in handling allegations of sexual abuse.  Penalties for the crime of solicitation include an order to move offending priests to other locations once they have been determined to be "delinquent."  In

response to allegations, the document mandates that supplementary penalties include "As often as, in the prudent judgment of the Ordinary, it seems necessary for the amendment of the delinquent, for the removal of the near occasion [of soliciting in the future], or for the prevention of scandal or reparation for it, there should be added a prescription for a prohibition of remaining in a certain place (Canon 2302)." *Crimen Sollicitationis* at paragraph 64. Defendant Holy See created and maintained this policy of secrecy and transfers, threatening all involved with excommunication and, thus, damnation, if they do not comply. According to *Crimen Sollicitationis,* once these penalties are levied, only the Holy See through the Congregation of the Holy Office, has the power to alter or remit the punishment.

In *Crimen Sollicitationis*, the Holy See created a specific procedure which local Ordinaries, as agents of Defendant Holy See were required to follow. Moreover, the commandment of silence regarding cases of sexual abuse embodied in the instruction on pains of removal (excommunication) operated to deprive the local agents of any meaningful discretion. Even if *Crimen Sollicitationes* can be read to allow the local agent of the Holy See to choose one of several specific options, the instruction from the Holy See nonetheless chooses those specific options, and mandates how each is to be handled.

Pope John Paul II issued an Aspostolic Letter, *Sacramentorum Sanctitatis Tutela*, dated April 30, 2001, available at http://www.bishop-accountability.org/resources/resource-files/churchdocs/Sacramentorum AndNormaeEnglish.htm#_ftn27 (last visited July 10, 2009), which confirms the direct relationship between Defendant Holy See and employees who commit these crimes of solicitation. The letter supplemented the 1962 *Crimen Sollicitationis* and confirmed its position as an executive disciplinary handbook:

"It is to be kept in mind that an Instruction of this kind had the force of law since the

Supreme Pontiff, according to the norm of can. 247, § 1 of the *Codex Iuris Canonici* promulgated in 1917, presided over the Congregation of the Holy Office, and the Instruction proceeded from his own authority… Pope Paul VI… confirmed the Congregation's judicial and administrative competence…Finally, by the authority with which we are invested, in the Apostolic Constitution, *Pastor Bonus,* promulgated on June 28, 1988, we expressly established, "[The Congregation for the Doctrine of the Faith] examines delicts against the faith and more grave delicts whether against morals or committed in the celebration of the sacraments, which have been referred to it and, whenever necessary, proceeds to declare or impose canonical sanctions according to the norm of both common and proper law," thereby further confirming and determining the judicial competence of the same Congregation for the Doctrine of the Faith as an Apostolic Tribunal.

**40.**

As a direct result of this negligent conduct, Plaintiff has sustained and continues to sustain the injuries and damages described above in paragraphs 17, 22 and 23.

### COUNT VII: FRAUD AND CONSPIRACY TO COMMIT FRAUD AGAINST ALL DEFENDANTS

Plaintiff incorporates each and every allegation contained in Paragraphs 1 through 40 of this complaint as if set forth in full herein.

**41.**

Defendants, by and through their agents, servants and employees, knew or reasonably should have known of Ronan's dangerous and exploitive propensities as a child sexual abuser and/or an unfit agent.

**42.**

Defendants misrepresented, concealed or failed to disclose information relating to sexual misconduct of their agents as described herein. Specifically, Defendants misrepresented and held Ronan out to the community of the faithful as being a fit and competent agent of Defendants and a minister of Christ.  Defendants misrepresented that Ronan did not have a history of sexually molesting children and that Defendants did not know about Ronan's history of sexually

molesting children.

**43.**

Defendants knew that they misrepresented, concealed or failed to disclose information relating to sexual misconduct of their agents. Specifically, Defendants knew that they misrepresented and held  Ronan out to the community of the faithful as being a fit and competent agent of Defendants and a minister of Christ.  Defendants knew that they misrepresented that Ronan did not have a history of sexually molesting children and that Defendants did not know about Ronan's history of sexually molesting children.

**44.**

The fact that Defendants' agents, including Ronan, had in the past and/or would in the future be likely to commit sexual misconduct with another minor, that Ronan had a history of sexually molesting children, and that Defendants knew about Ronan's history of sexually abusing children was a material fact in Plaintiff's and his family's decision whether or not to allow Plaintiff to attend and participate in activities at St. Albert's Church in Portland, Oregon and with Defendants' agent - Ronan.

**45.**

Upon information and belief, Defendants misrepresented, concealed and failed to disclose the material facts to Plaintiff and his family with the intent to avoid scandal, to keep Plaintiff and his family going to and paying money to St. Albert's Church in Portland, Oregon, to keep Plaintiff and his family in the Community of Faithful, and in order to maintain an adequate number of agents.

**46.**

Plaintiff and his family were justified in relying on these misrepresentations, concealment and non-disclosures because of the power imbalance between the parties, Plaintiff's age, and Plaintiff's trust and confidence in Defendants. Had Plaintiff or his family known about Ronan's history of sexually abusing children, Plaintiff would have acted differently and not been in a position to be sexually abused.

**47.**

Upon information and belief, Defendants, in concert with each other, with the intent to conceal and defraud, conspired and came to a meeting of the minds whereby they would misrepresent, conceal or fail to disclose information relating to the sexual misconduct of Defendants' agents, including Ronan. By so concealing, Defendants committed at least one act in furtherance of the conspiracy.

**48.**

As a direct result of Defendants' fraud and conspiracy and Plaintiff's justifiable reliance, Plaintiff has sustained and continues to sustain the injuries and damages described above in paragraphs 17, 22 and 23.

**DEMAND FOR TRIAL**

Plaintiff hereby demands a trial by jury in this matter as to Defendants Archdiocese, Catholic Bishop, and Order and a bench trial as to Defendant Holy See.

**PRAYER**

Plaintiff prays for judgment against Defendants, and each of them, for non-economic and economic losses described herein and for Plaintiff's costs and disbursements.

DATED this _____ day of _____, 2009.

JEFF ANDERSON & ASSOCIATES, P.A.

_____

Jeffrey R. Anderson, MSB No. 2057
*Admitted pro hac vice*
366 Jackson Street, Suite 100
St. Paul, MN 55101
Phone:  651-227-9990

Marci A. Hamilton, Esq.
36 Timber Knoll Drive
Washington Crossing, PA  18977
(215) 353-8984
(215) 493-1094 (facsimile)

ATTORNEYS FOR PLAINTIFF